In the Matter of WILLIAM A. SCHACHT, an Attorney, Respondent.

First Department, February 14, 1930.

*Isidor J. Kresel* of counsel [*I. Howard Lehman, Leon Leighton* and *Chester Rohrlich* with him on the brief], for the petitioners.

*William A. Schacht* [*Robert S. Johnstone* and *Hugo Wintner* of counsel], respondent in person.

DOWLING, P. J. The respondent was admitted to practice as an attorney and counselor at law in the State of New York on November 28, 1911, at a term of the Appellate Division of the Supreme Court of the State of New York, Second Department.

The petition charges that respondent has been guilty of misconduct as an attorney at law, *first*, in the solicitation of personal injury cases with specific instances of solicitation alleged; and, *second*, in retaining fees in infants' cases in excess of the amount allowed by court order. The respondent's answer denies any misconduct. The matter was sent to a referee by order of this court, to take testimony in regard to the said charges and to report the same with his opinion thereon to this court. The referee has filed his report and the petitioners move the confirmation thereof. The referee has found that respondent has (1) obtained his retainer by practices which are fairly to be characterized as "solicitation;" and (2) has withheld from infants' funds received by him a larger amount than that provided by order of the court.

It is the contention of the respondent that the evidence failed to justify these conclusions of the referee, and that in no instance was the respondent proven guilty of solicitation, nor has he been proven guilty of withholding any funds in any action, but on the contrary that his dealings with his clients have been open and above board and honestly and fairly done.

According to the referee instances of solicitation were proved in the Peterssen, Dreyfus, Corsi, Leonhard, Hults, Diez, Fahey and Hamilton cases. On this motion petitioners make no attempt to support the conclusion so far as the Dreyfus case is concerned, but confine their efforts to the remaining seven.

Taking the Peterssen case first, the following is part of the testimony given by Policeman Berthold Peterssen, whose son was injured

in an accident about five years ago: " Q. Did you retain a lawyer in connection with that accident? A. I did. Q. Who was that lawyer? A. William Schacht. * * * Q. Did you know Mr. Schacht at the time of the accident? A. Not at the time I did not. Q. Did anybody come to see you about this accident with relation to retaining an attorney? A. Yes, there was a gentleman came to me, but I don't know him. * * * Q. What transpired. between you and that gentleman? A. He came up and he asked me if my little fellow was hurt, that is all, and asked me if I had a lawyer. Q. And what did you say to him? A. So I told him no. So he told me he knew of a good lawyer, will I give him the case? So I told him I would think over it. So he came back again. Q. When did he come back again? A. Oh, about the next day I think it was. Q. Had you sent for him? A. No, I hadn't sent for him. He came back. So I told him I heard Schacht was pretty good, and I said I would give him the case. Q. Did he state that he represented Mr. Schacht? A. He did. Q. And asked you to retain Mr. Schacht as your lawyer? A. Yes, sir. Q. Had you ever seen this gentleman before he came to see you the first time, as you just mentioned? A. I don't know him. Q. You hadn't sent for him? A. No. Q. And you did not know Mr. Schacht at the time? A. Not at the time, no."

Mr. Peterssen then testified that when he told his visitor that he was prepared to retain Mr. Schacht, his visitor gave him a paper to sign.

Respondent's brief contains the following: " Upon cross-examination Mr. Peterssen stated that the man who called upon him may have lived in the neighborhood, and that he had seen him once or twice before, and that he may have been a member of the Club to which Peterssen belonged.

" * * * The inference to be drawn from the evidence is that a party living in the neighborhood and a member of the Club to which Mr. Peterssen belonged was sufficiently interested to call Mr. Peterssen's attention to the name of the respondent, whom the party evidently believed capable of rendering competent services."

We find that the testimony justifies no such inference. Peterssen's answers are emphatically to the effect that he never saw the man before he called .with regard to the accident. The statement in respondent's brief to the effect that Peterssen on cross-examination stated he had seen the man once or twice before is not correct. Peterssen's exact language is in response to the following question: " Q. Did you know whether this man that came to see you didn't live in your neighborhood — was one of

your neighbors? A. I don't know if he did or not, it is so long ago. I only seen him once or twice, at the time. He may have lived in the neighborhood, but I don't know."

The second case is the Corsi case. Joseph Corsi testified that he was hit by an automobile in June, 1923. He was then nineteen years old. Following the accident he was treated in a drug store by an ambulance surgeon. He refused to be taken home in the ambulance and walked home by himself. On the way home there was a man who wanted to take the case, but he did not give it to him. Corsi then testified as follows: " Q. Wait a moment. So you didn't give it to him? A. No, not the first one. And by walking again I met another man; so he took me home and he came up to the house, and he told me that I should give him the case; so we agreed, we give it to him. Q. Had you ever seen this man before? A. No. Q. Did he tell you what his name was? A. Yes, he told me but I cannot remember his name now. Q. He asked you to give him the case? A. Yes. Q. Was he a lawyer or was he representing a lawyer? A. He represented a lawyer. Q. Did he say who the lawyer was? A. Yes, William A. Schacht. * * * Q. Before this man met you and asked permission to represent you and have Mr. Schacht act as lawyer, had you ever met him? A. Never. Q. Never saw him in your life? A. Never saw him before. Q. Had you ever met Mr. Schacht prior to that? A. Never. Q. Never heard of Mr. Schacht before that time? A. No, sir."

Mrs. Felicita Corsi testified that she talked to the man who came home with her son. Her testimony in part is as follows: " Q. Did he talk with you, this gentleman? A. Yes. Q. Had you ever seen him before? A. No. Q. What was his talk with you? A. He took the boy home and he was there when the accident happened, I suppose, he took him home, he was very injured at that time, and he told me he was the runner of the lawyer Schacht if I wanted to give the case to him to fight over the case, and we don't know nothing about it because we never was in that trouble, and we accept him. Q. He told you that he represented Mr. Schacht? A. Yes. Q. And that he wanted the case for Mr. Schacht? A. Yes. * * * Q. And you had no other lawyer? A. No. Q. And you did not know Mr. Schacht at that time, did you? A. No. Q. You had never heard of Mr. Schacht? A. No, not before. Q. Nor had you ever heard of this man who came to you? A. No. Q. You had not asked anybody to send any lawyer to you? A. No. I never bothered with anyone on the outside. He just got in, that is all. Q. Did he give you a paper to sign? A. I signed a contract. Q. A contract to have Mr. Schacht handle your case for you? A. Yes."

Respondent's testimony in regard to the Corsi case is that a former client of his called upon him and told him that he had met a young man who had suffered an injury and that probably the young man would want the respondent to handle the case. The respondent told him he would take care of the matter, after which the mother called upon respondent at his office, where he was retained.

In the Fahey (Femoyer) case, and the Hults case, the testimony is along the same line as the Peterssen and Corsi cases. The guardians testified to an accident, with an injury to an infant and the intrusion of a stranger urging and securing a retainer for respondent. In the Hults case respondent testified that his office was called on the telephone with a request that someone be sent to see Hults.

Thomas J. Hamilton testified that his son, Thomas, Jr., was injured in an automobile accident in November, 1924, at the same time one of the Horan boys was injured. He further testified as follows: " A. The evening of the accident I took him to the hospital that day, my child, and Horan's boy, they got a doctor for. Well, that night, I guess around eight o'clock some man came representing Mr. Schacht — Q. You say representing. He stated that he represented Mr. Schacht? A. Well, he stated that he was from Mr. Schacht's office. He came up to my house and said a friend of mine sent him up. I said, ' Who is he? ' And he mentioned the name of some friend he knew. He said, ' I have that Horan case and would like to get your case.' I think he said I have the Horan case. I said, ' I ain't had any occasion to get a lawyer.' He said, ' Well, can I come around in a day or two and see you? ' I said, ' Well, I will think it over, I will see Horan tomorrow and ask him does he know about Mr. Schacht.' So Mr. Horan, he is dead now, and he worked in the park, I waited for him that night. I says to him, ' Did you give your case to Mr. Schacht? ' And he said, ' Yes.' I said, ' Do you know anything about him? ' and he said, ' Well, I hear he is a pretty good lawyer.' Well, the fellow came around — I ain't sure, it was Monday night this happened and I was out, and Tuesday he came again and said, ' What are you going to do about the case? ' I said, ' As long as you have Horan's case I think you might as well take my case.' So he give me a card to go down and see Mr. Schacht."

He went to respondent's office and arranged to have respondent take the case. He further testified as follows: " Q. * * * Had you ever met this man before? A. No. Q. Did you know what his name is? A. No, I really don't. I heard the name but I don't know now. Q. Did you ask any one at that time to send any one to you? A. No."

As to the Hamilton case, respondent testified: " Someone telephoned to the office and I told Mr. Zeller to go up to see Mr. Hamilton, and I instructed him at that time to tell Mr. Hamilton who it was that phoned. I assumed that Zeller did tell Mr. Hamilton who it was. I have no personal recollection now who it was that phoned."

Respondent's man, Zeller, secured the retainer in the Hamilton case. Speaking of Zeller's activities there, respondent testified: " It may be possible that he overstepped himself in his zeal to secure that case."

Carmel Leonhard testified to having been injured in an accident, following which a man who told her he was Mr. Schacht's brother, called and she signed a paper hiring respondent as her lawyer; that she had never heard of respondent before and had never met the man who came to her after the accident, and she had not sent for him.

As to the Leonhard case respondent testified he could not tell the circumstances of the case coming to his office. He testified that none of his brothers had anything to do with procuring cases for him.

In the case of Julien E. Diez, who was injured in January, 1925, his wife, Sophie May Diez, testified that she first learned of the accident from her brother who telephoned and said her husband had been injured and taken to the Knickerbocker Hospital. In the afternoon of the same day a man called to see her and said he represented Mr. Schacht. She testified: " He said that this was quite a serious accident and we would need probably the services of a lawyer, and that he could assure me that Mr. Schacht would be honorable and upright, was accustomed to handling that kind of case, and would take it on a fifty-fifty basis. He asked me if I would sign the paper, and I said, that so far I had done nothing without Mr. Diez's consent. * * * And then he said it would be perfectly all right. I said, ' Why isn't it printed? ' He said, ' It usually is not on this form but that is what is usually done, where the husband is not present,' and he would see my husband later." The man promised he would see Mr. Diez and get his consent. After he assured her that he would get her husband's consent to it, she signed. He then left. She had asked no one to send a lawyer, had spoken to no one about retaining a lawyer, had never seen this man before and had never heard of Mr. Schacht before.

Attempts to secure Mr. Diez's signature to a retainer failed. He retained another attorney who commenced action January 22, 1925. On the strength of the wife's retainer. respondent served

a summons on behalf of Diez and followed it with an unverified complaint. The summons was served January 16, 1925, and the unverified complaint is dated February eighteenth. Under date of February twenty-sixth, Mrs. Diez wrote respondent asking him to discontinue his services, after a letter had been written by Mr. Diez in January stating that he wished respondent to step out as an attorney. The action commenced by respondent was discontinued March 11, 1925.

Respondent's testimony in the Diez case is to the effect that some one called his office, asking him to come up and secure his retainer, that he had been injured. Respondent sent some one up to the house of Diez and when he came back with the report that he had secured the retainer from Mrs. Diez, Mr. Diez was still in the hospital, and respondent commenced the action on the retainer of Mrs. Diez, feeling justified because of the inaccessibility of Mr. Diez in the hospital. Respondent testified that prior to the receipt of the letter from Mr. Diez asking him to discontinue his interest, Mr. Diez called at his office, wanting to know how the case was progressing; that on this occasion Diez left one of his business cards with respondent. There is a sharp issue as to whether Diez called at respondent's office. The testimony of Mr. and Mrs. Diez is to the effect that Diez was unable to leave the house until after the middle of February, at least. Mrs. Diez said she gave her husband's card to respondent's man when he called for the case. Respondent contends the reason for the denial of the visit to his office is to be found in the bill of particulars in the Diez action wherein Diez swore he was confined to his home for a period of five weeks.

From the record we think it is clear that in the Peterssen, Corsi, Fahey, Hults, Hamilton, Leonhard and Diez cases there was that seeking out of those with claims for personal injuries which is condemned by the Canons of Ethics. In view of the retainer in the Horan case, which grew out of the same accident, the intrusion in the Hamilton case was not as offensive as in the others. We agree with the referee that the retainers in these seven cases were obtained through solicitation. On behalf of respondent it is urged that since the referee has found that there is no evidence tending to show that respondent ever paid any one for securing a retainer for him, and that there is no direct evidence that he personally participated in solicitation, the respondent cannot be charged with solicitation in contemplation of either the Canons of Ethics or the Penal Law. Proof of payment to a solicitor for his services as such is not essential in these disciplinary proceedings. Records of such payment are rarely kept, with the

result that evidence relating thereto usually depends upon the willingness of the attorney or the recipient of the compensation to come forward therewith.

Respondent was admitted to the bar in 1911. He discontinued the practice of the law in 1914 and went into the business of manufacturing motion picture screens, but when the war made it impossible for him to secure further materials or to sell out his stock on hand, he returned to the practice of the law in 1918, being employed in the office of another lawyer until 1920, when he went into the office of one Silverstein, doing trial work for him, principally in negligence cases, under an arrangement by which he was to receive fifty per cent of the fees in cases which he tried, and fifteen per cent in cases which he settled. He began doing business for himself in 1923. It was while he was with Silverstein (who has resigned as a member of the bar) that he first met Zeller, who was working for the latter as an investigator. Respondent admits that he employed Zeller as an investigator at a weekly salary of sixty dollars, which was once increased to seventy-five dollars and then reduced to sixty dollars; that Zeller also received his expenditures, including payments to doctors who were witnesses in cases, running sometimes to two hundred dollars or three hundred dollars. Respondent discharged Zeller because he found him guilty of many acts of impropriety, but he claims never to have even suspected that Zeller was soliciting cases for him. He made no effort to obtain Zeller as a witness because their relations are strained. But, although paying Zeller sixty dollars or seventy-five dollars weekly, respondent made a general charge of twenty-five dollars for " investigation " in all his applications for orders fixing his fees in infants' cases. These he claimed were payments to outside investigators and that Zeller did not know how to interview witnesses properly; all he knew was to get the police blotter report and the first information concerning the accident.

Respondent had no bookkeeping system, no book of entry, and only kept his checks as records. But it so happened that he had thrown away his check stubs for the years 1924 to 1926, inclusive, during which Zeller worked for him. He had lost his vouchers also, but he was able to produce his checks in the Fahey matter, and in the Gaucher matter, more particularly hereinafter referred to, which he thought would help him.

It is interesting to note that in respondent's office he employs a clerk who has been refused admission to the bar, and a lawyer who has been a member of the Illinois bar for twenty-six years, but who has never applied to be admitted in this jurisdiction.

The proof on the charge of retaining fees in excess of the amount

allowed by the court in infants' cases discloses that in each instance the respondent entered into the retainer agreement with the parent or guardian of the infant before any steps were taken to enforce any claim on a fifty per cent basis. After respondent was retained, he would cause a guardian *ad litem* to be appointed and then prosecute the claim. Upon the settlement of the infant's action, despite the amount fixed by the court, respondent would inform the guardian that he believed himself entitled to the amount of his retainer and that it would be necessary for such guardian to pay the difference. The following shows cases in which this was done, with the amount fixed by the court and the sum retained by respondent:

| Name of infant | Settlement | Fee fixed by court | Retained by respondent |
|---|---|---|---|
| Clifford Hults | $400 | $126 | $200 |
| James Ward | 150 | 40 | 75 |
| Phyllis Femoyer | 250 | 85 | 125 |
| Thomas Hamilton, Jr | 450 | 135 | 225 |
| John Horan, Jr | 450 | 125 | 225 |
| James J. Burns, Jr | 300 | 88 | 150 |
| Joseph Corsi | 600 | 201 50 | 300 |
| Robert Abernethy | 500 | 126 50 | 250 |
| Charles Gaucher | 750 | 200 | 375 |

In each of the above cases, except the Abernethy and Gaucher cases, the settlement represented payment for the infant's cause of action alone. In the Abernethy case the infant's cause of action was settled for $500, and the parent's action for $150, making a total of $650 in the two actions. Thomas Abernethy testified he received $325 in settlement of both actions. In the Gaucher case the infant's cause of action was settled for $750 and the parent's action was settled for $250, making a total of $1,000. The order in the infant's action allowed respondent $200. If he had taken this amount plus fifty per cent in the parent's action, he would have retained $325, leaving $675 to be paid to the parent and guardian *ad litem*. Mrs. Alice Gaucher testified that she received $500 in cash in her home from respondent's man Zeller. Respondent produced a check in the amount of $675 indorsed by Mrs. Gaucher. Respondent dismisses the Gaucher situation in his brief as follows: "The question cannot arise in the Gaucher case, as the evidence conclusively establishes that she received all moneys due her according to the order." This, apparently, in an effort to repudiate the conduct of his own representative.

An attorney accepting a retainer to prosecute a claim on behalf

of an infant is advised in advance that his compensation is limited by section 474 of the Judiciary Law (as amd. by Laws of 1912, chap. 229) to such amount as may be allowed by the court. We have already expressed our views in relation to the necessity for the fixation of fees in infants' cases by the court in *Matter of Jeromer* (228 App. Div. 123) and *Matter of Goldberg* (227 id. 502), and the section prohibits the receipt from the guardian of more than the amount so fixed. Respondent's contention relative to a contract with the parent or guardian, as distinguished from the guardian *ad litem*, fails. No one can be deceived by such an argument. It is the money received on the settlement of the infant's claim that is looked to as the source of compensation for the attorney, and when the attorney takes more than the court allows, it is the infant's funds that are being depleted. Careful reading of the record herein discloses that in no case was the guardian *ad litem* fully advised as to his rights. Respondent claims that if the parent objected to paying the difference between the amount allowed by the court order and fifty per cent due under his retainer, he would not press the point, but accepted the amount named in the order, thus recognizing the limitation created by law and showing his knowledge thereof. We cannot too strongly condemn the evasion of the Judiciary Law in these infants' cases.

The report of the referee should be confirmed and the respondent disbarred.

MERRELL, FINCH, McAVOY and PROSKAUER, JJ., concur.

Respondent disbarred.