In the Matter of JOHN F. VAIL, an Attorney, Respondent.

First Department, February 14, 1930.

*Isidor J. Kresel* of counsel [*F. Sims McGrath* with him on the brief], for the petitioners.

*Henry L. Brant,* for the respondent.

DOWLING, P. J. The respondent was admitted to practice as an attorney and counselor at law in the State of New York on October 8, 1918, at a term of the Appellate Division of the Supreme Court of the State of New York, Second Department.

The petition herein charges that the respondent has been guilty of misconduct as an attorney at law, as follows: (1) Solicitation of negligence cases, employment of persons not members of the bar to solicit negligence cases, and payment of money to persons for obtaining accident claims, with specific instances of solicitation set forth; (2) failure to obtain court orders fixing his fee in infants' cases; and (3) the withholding of money collected in an infant's case. The respondent answered the petition and by order of this court the matter was referred to a referee to take testimony in regard to the said charges and to report the same with his opinion thereon to this court. The referee has filed his report and respondent has moved the confirmation thereof.

The learned referee reports that in his opinion " the charges against the respondent have not been sustained and the petition should be dismissed." We cannot follow the referee to this extent.

As to the charge of withholding client's money, the record shows the concession of petitioners that the evidence did not sustain such charge.

As to the charge of failure to obtain court orders fixing respondent's fee in infants' cases, the only testimony on this charge is that of respondent himself, which is as follows: " In all infant cases I brought I, in conjunction with the infant case, brought

a loss of service action. If the loss of service action and the infant action were settled for an amount of less than $100.00, I got no court order. Q. Do you mean if the two cases combined were settled for less than $100? A. I do. Q. And if the total settlement of the two cases was over $100, do I understand you that you always got a court order? A. No. If the total settlement of both cases amounted to $100 or more I got a court order."

He admitted he followed his practice of failing to obtain a court order in three or four cases where the settlement amounted to less than $100; that he was under the impression that in infants' actions settled for less than $100 a court order was not necessary.

Respondent, in failing to obtain an appropriate court order in these infants' actions, ignored the provisions of section 474 of the Judiciary Law (as amd. by Laws of 1912, chap. 229) and rule 294 of the Rules of Civil Practice.

On the charge of solicitation of negligence cases, there is testimony by Joseph F. Stevens, Joseph Turkel, Josephine LaGattuga and Rebecca Rosenzweig to the effect that each was involved in a different accident, following which they were interviewed by a stranger, resulting in the retention of respondent and the eventual settlement of the claim. Respondent himself admitted that he had no independent recollection of how he obtained these cases.

Minnie Frank testified that about three years ago she was hit by a wagon, following which she had a conversation with a policeman in reference to engaging a lawyer; that the policeman came to her house a couple of times. Thereafter a Mr. Perlstein (the correct name was subsequently shown to be Perlman) came to see her, said he was a lawyer and she should give him the case, which she did and signed a paper. She subsequently went to the respondent's office to be examined by the company's doctor, in response to a letter she received from respondent, who told her he was working on the case for her. Respondent admitted that Perlman recommended the case to him, but contended that Miss Frank signed the retainer in his office.

Harold Bertelson testified that in 1926, when he was sixteen years old, he was struck by an automobile; following the accident a man named Hoffman called at his home; Hoffman said he would take the case up with a reliable man, a lawyer. Bertelson testified that a fifty per cent retainer was signed by his mother before he came home and respondent's name was on the paper. Hoffman testified that he never had any retainer in the Bertelson case. His testimony on that point is as follows: " The only cases I got retainers for was when Mr. Vail told me that somebody had called

up and wanted him to get retainers, and then I got retainers. But in this Bertelson case I did not get any retainer."

Hoffman also testified: " Q. Do you know or do you remember a young man named Bertelson, who had an accident case in Mr. Vail's office? A. I do. Q. When did you first see him? A. Well, the time I cannot remember, but I was assigned to investigate that case and to prepare it for trial in the First District on Grand Street, and in connection with that I went to his home and interviewed him, and I was also told he was employed by someone and to make arrangements to have his compensation paid, which I also took care of. And then, after that first visit, I think I went to his house three or four times to notify him to go to court, but on those various occasions the case was not reached for trial."

Hoffman was quite positive he never had a retainer signed by Bertelson's mother.

If we eliminate the Bertelson case, there is uncontroverted testimony of five instances where there was an accident with an injury to some individual closely followed by the intrusion of a stranger urging and securing the retention of respondent to prosecute the claim for damages to the injured. This is one phase of the " ambulance chasing " evil which is sought to be corrected.

The only testimony relating to the charge of payment of money for obtaining cases was that given frankly by respondent himself, as follows: " Q. Have you ever paid anyone or given anyone money in connection with cases which they have referred to you? A. I have. Q. Explain, please, the circumstances in which this has occurred, and what you did? A. About April or May, 1924, I had a case in which Herman Schmidt, 203 East 77th Street, was injured; and at that time I represented him. Shortly thereafter we effected a settlement, and according to the terms of my agreement, I took 50 per cent and gave him 50 per cent. Subsequently thereto, within the course of two and a half years approximately Mr. Schmidt referred to me approximately five or six cases, these clients being neighbors or friends of his — I might say in this connection that Mr. Schmidt then was employed by the Metro-Goldwyn-Mayer Corporation, as watchman. Of these five or six cases I subsequently settled three cases. After these cases were settled, it was Schmidt's custom to come to my office within a period of two weeks to a month and a half and we invariably discussed the termination of the case, and on each one of these three cases that had been adjusted, or had been settled, I gave Schmidt $10 or $15 on each one. I am not clear as to which it was, whether $10 or $15, but somewhere around that. Q. But this was not the result of any previous or any pre-arranged agree-

ment or contract? A. No, I never had any arrangement with Herman Schmidt to give him any money at all. This was a voluntary action on his part in referring a case to me, and it was a voluntary act on my part, after the case was settled, of giving it to him; but in all fairness I will state that I think he did expect money from me for the reasons that he mentioned, ' Don't you think I am entitled to something,' or ' Won't you make me a small loan,' and when I made the loan I considered it a gift and it subsequently turned out to be that."

Respondent also testified to a similar course of conduct with one Sam Berg. The testimony is as follows: " Shortly thereafter I had a case for an uncle of Sam Berg, 45 Canal Street. That case was successfully settled. During the course of it, however, Sam Berg called at my office several times. By the way, I might say he was employed at a clothing store at 45 Canal Street as a salesman — and during the course of the next two to three years he recommended six or seven different persons to me as clients, and suit was subsequently started in my name, and four, to the best of my recollection, were settled. After the case was settled I gave Berg $25 in one case. I am quite sure I gave him $20 in two other cases, making a total of $40 in the two cases; and in another case I gave him $10. On one of these cases I particularly remember his father had a flour store, selling flour, and in the meantime I was acting as attorney for his father who got several suits instituted against him, and he told me that he wanted to borrow some money from me to help his father out, and that was one of the $20 that I loaned him; but I considered it a gift, and it was a gift as it so happened. It never was paid back."

Questioned by the referee, respondent stated that he would not have made the loan or gift to Berg following the settlement of one of the cases, if the case had not been recommended by him.

In a discussion just preceding the close of the hearings before the referee, in reference to subdivision 2 of section 274 of the Penal Law, in which discussion the referee, counsel for petitioners and the respondent took part, the respondent made the following statement: " I never promised to give anything either before the action was recommended to me or after it was recommended. I did give money to Berg and Schmidt on a few occasions, from two weeks to a month and a half after the action had been terminated, and the fact of my giving the money was not a condition precedent to their recommending this case; and in fact my giving the money had nothing to do with their recommending this case. It was a voluntary gift by me after the hearing had been closed."

Regarding these payments to Schmidt and Berg, the referee,

in his report, states: "These payments, made in 1924 and 1925, constituted at least a technical violation of the law, and were at any rate incompatible with the high ethical standards of the legal profession.

"I am inclined to believe, however, that these acts were committed thoughtlessly rather than in a spirit of wilful and deliberate disregard of duty and professional proprieties."

We are mindful of the fact that the testimony of payments to Berg and Schmidt is before us only because of respondent's frank and voluntary admissions. Originally these individuals may have been volunteers, but the repeated loans or gifts destroyed the disinterested character of their services. We have no evidence as to the amount of settlements involved and have no way of determining what relation, if any, the size of the loan or gift had to service rendered.

The proved solicitation of cases and these payments to Berg and Schmidt satisfy us that respondent has failed to follow the standards of the profession, for which he should be suspended from practice for the period of six months, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.

MERRELL, FINCH, McAVOY and PROSKAUER, JJ., concur.

Respondent suspended for six months.