IN RE P., A MEMBER OF THE BAR OF THE STATE OF
NEW JERSEY.

Decided November 13, 1933.

Before Justices PARKER and LLOYD.

For the prosecutor, *Joseph L. Smith* and *Simon L. Fisch.*

For the respondent, *Merritt Lane* and *John J. Clancy.*

PER CURIAM.

Two charges were made against P., a member of the bar,
of unethical conduct in the practice of his profession. The
first of these was heard by the board of bar examiners to whom
it had been referred by the court; the second was heard by
the ethics committee of the Essex County Bar Association.

In the first disciplinary action by the court is recommended
to the effect that the member should be suspended from prac-
tice for the period of one year; in the second, there is a find-
ing that P. (hereinafter called the respondent), has been
guilty of "most unethical and unprofessional conduct" and
the matter is submitted to the court for such action as it deems
necessary and proper.

The first of these charges was in the form of a complaint
by one Peter Kronos to the effect that the respondent had
issued checks on his account as attorney well knowing that
the funds were not in the bank to meet them.

The undisputed facts, both as charged and as admitted,
were that on November 29th, 1929, the respondent gave to
Kronos two checks dated the following day, one for $350 and
the other for $441. They were drawn on the Guardian Trust
Company of Newark and there were not in that account funds
sufficient to meet them. The statement of the parties is some-
what at variance as to the purpose for which these checks

were issued. It is fair to say that no moneys or other credit were obtained upon their issuance other than might be implied in the testimony of the complainant that the checks were to pay complainant's own wages as the manager of a restaurant and that of employes, and for the payment of rent, or if the testimony of the respondent be credited, that they were given as part of the proceeds of a check which had been deposited with the respondent by one Murphy on account of the purchase price of the restaurant which the respondent was authorized to sell, and therefore perhaps does not fall within the provisions of chapter 72 of the laws of 1919, page 133, which declares that "any person who, with intent to defraud shall make or draw, or utter or deliver any check * * * upon any bank or other depositary, knowing at the time of such making, drawing, uttering or delivering that the maker or drawer has not sufficient funds in or credit with such bank * * * for the payment of such check * * * upon its presentation, shall be guilty of a misdemeanor."

In view, however, of the want of credence which the board of bar examiners and this court places in the respondent's story, the issuance of the checks exhibits a clear purpose to deceive and mislead the person to whom they were given. If this were all in connection with this charge, the misconduct of the respondent, as it appears to us, would be far less serious than later evidence shows it to be, and for this reason: When the respondent was called to account before the board of bar examiners he testified under oath that he was endeavoring at the request of Kronos to obtain a purchaser for the restaurant; that a Greek by the name of Murphy called upon him and inquired about the restaurant; said he was from Jersey City, had heard the restaurant was for sale and asked the price; that Murphy was given a price of $3,500 and returned in a week offering $3,000 which the respondent accepted subject to Kronos' approval; that respondent received a check from Murphy for $1,000 upon the back of which Murphy wrote something to the effect that it was a deposit on account of the purchase price of $3,000 for the restaurant. The alleged Murphy was a stranger to the respondent; no pains

were taken to ascertain his identity or responsibility. Respondent did not even recall with certainty the bank upon which the check was drawn. This same check, against which the two checks heretofore described were issued, was later returned to the alleged Murphy without explanation. This story for these reasons, and others unnecessary to recount, the board of bar examiners deemed a myth and without substance. To that conclusion this court after examination of the testimony gives assent.

There is, therefore, added to the initial misconduct of the respondent in the issuance of the checks with the knowledge that there were no funds with which to meet them, the false testimony to extricate himself from the dilemma in which he found himself. This testimony exhibits a moral delinquency which calls for the animadversion of the court and the exercise of its power of discipline.

The second charge now before us, is even more serious. Respondent had been counsel for Alexander Smart and his wife, Mary Smart, in a claim for damages growing out of an automobile accident in June, 1931. After negotiations with the New Jersey Manufacturers' Casualty Insurance Company, the insurer of the corporation against which the claim was made, a settlement was agreed upon. Smart and his wife, on May 24th, 1932, executed a release and this was forwarded to the insurance company. The latter on the following day drew its check in the sum of $400, the amount agreed upon, to the order of the respondent as attorney and Mary Smart and Alexander Smart. This check was received by the respondent on the following day and obviously called for the endorsement of the respondent and the claimants to whose order it was drawn. Instead of obtaining the endorsements of the Smarts to the check, as he was bound to do, the respondent signed their names and his own on the back of the check and deposited it in his trustee account in the New Jersey National Bank and Trust Company on May 26th, 1932. The endorsement thus given was not authorized by Smart or his wife, if their testimony is to be believed, and the conduct of the respondent lends strong credence to this

fact, for, according to his own testimony, after the check had been received he carefully imitated the signatures of the other payees knowing that the insurance company had the release with their proper signatures and could compare them, and believing, as he says, that the bank would unquestionably otherwise refuse payment because of the dissimilarity of the handwriting. So that in any event there was a deception of, and fraud upon, the insurance company in leading that company to believe that the signatures of the clients had been affixed by themselves. An amazing feature of this branch of the case was that the respondent at the hearing frankly admitted the imitation of the signatures and was apparently unable to see anything unethical in the act.

The subsequent history marks the situation with extreme duplicity and want of fidelity in dealing with his clients. The check of the insurance company having been deposited as stated with the New Jersey National Bank and Trust Company, that institution closed its doors on the 10th of June, 1932. In the meantime respondent communicated with his clients stating that the release they had signed was insufficient and that separate releases were required by the insurance company before it would issue its check, notwithstanding the fact that the release already given had been accepted by the insurance company and its check issued thereon and deposited in respondent's account. It appears additionally that the funds in the account were drawn upon and applied to respondent's personal uses so that on the 8th of June there was less than $100 in the account.

It is true the respondent asserts that he was authorized to endorse the names of his clients, and it is true that he says that he had certain funds in his home with which to meet their just demands for their share of the proceeds of the check given by the insurance company, but his conduct in imitating the signatures of his clients, in deceiving them as to the status of the claim and his misrepresentation that the insurance company had demanded additional releases long after payment of the claim, discredits the whole of his testimony which in any measure is defensive to the charge made against him.

In the Kronos case the respondent obtained a rehearing by the bar examiners in which he attempted to bolster up the claim of the *bona fides* of Murphy and his check and the board has rendered an additional report to the effect that it does not find that anything has been submitted which would justify any change in the report filed.

A careful reading of the reports and the testimony taken in both of these cases, together with an examination of the exhibits presented convinces us that the findings are wholly justified and that nothing short of substantial punishment is adequate to meet the requirements of the situation. Here is a trusted member of the bar whom the court has licensed to practice law and thereby held out as worthy of public confidence and trust. This confidence has been grievously abused and in his conduct the respondent has exhibited himself as guilty of acts and conduct not only unethical in his profession but dishonest, if not criminal.

One of the sad features of this case is that the respondent seems not to appreciate that his conduct was wrongful, he having so stated to the court on more than one occasion. His further statement that he was a graduate of Columbia University and should know the distinction between right and wrong goes not to his credit but the contrary. Morality is a matter innate to the human mind. When to the native mind is added the culture of a great university education, departure from the right becomes even more reprehensible.

Respondent has exhibited a moral delinquency which might by possibility be of a character to render him unfit to longer continue as a member of this honorable profession, but in view of recommendations as to his character otherwise, the court deems it is not called upon to go to the extreme of dismissing him from the bar. His conduct, however, does demand serious and substantial punishment, and to this end he will be suspended from the further practice of the law in this court for the period of two years from the date of the order to be issued in pursuance of this opinion and thereafter until the further order of the court. His conduct in the meantime will determine if this ban shall then be lifted.