## IN THE MATTER OF CHARLES FRANKEL, AN ATTORNEY-AT-LAW.

Argued October 17 and November 21, 1955—Decided February 13, 1956.

589

For the rule: *Mr. Harold H. Fisher*, by designation of the court.

*Contra*: *Mr. John E. Toolan* (*Mr. Sam Weiss*, on the brief; *Messrs. Toolan, Haney & Romond*, attorneys).

The opinion of the court was delivered by

HEHER, J. The respondent attorney-at-law, in practice at Asbury Park, was ruled to show cause why he should not be disbarred or disciplined for violations of *sections* 28 and 34 of the *Canons of Professional Ethics*, as found by the Honorable Lester A. Drenk, Judge of the County of Burlington, in a report made to this court under date of September 6, 1955, pursuant to a reference made June 23, 1955.

Judge Drenk reported that the respondent Frankel and one Low had entered into and pursued an arrangement for the "procurement of automobile negligence cases by Low for Frankel, for which Frankel rewarded Low by paying him 25% of Frankel's net fee less $40," a sum paid at the outset "ostensibly for photographs," of which more hereafter.

*Canon* 28 declares it to be "disreputable" for a lawyer to "breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office, or to remunerate policemen, court or prison officials, physicians, hospital attaches or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services." A duty to inform, in the interest of the public and the profession, is laid upon every member of the bar having "knowledge of such practices" by any practitioner, "to the end that the offender may be disbarred." And *Canon* 34 provides that no "division of fees for legal services is proper, except with another lawyer, based upon a division of service or responsibility."

There can be no doubt that Low solicited negligence cases for the respondent Frankel, even where the injured person had retained counsel to act in his behalf. He made it a practice to photograph the area of the particular accident and the vehicles involved; and he then called upon the victim at the hospital or in his home, as the case might be, exhibited the photographs as important pieces of evidence, and sought a retainer for the respondent as a specialist in the field. He had at his bedside a radio tuned in to police broadcasts of automobile accidents, and not infrequently he was on the scene even before the arrival of the police or the ambulance. This early contact with the injured person possessed of photographic evidence of the locale served his primary purpose of arranging a retainer for the respondent.

Low called on Jeremiah P. Davis, a patient at the Monmouth Memorial Hospital undergoing treatment for injuries sustained in an automobile accident on January 10, 1953, and sought a retainer for respondent after Edward W. Wise, Jr., an attorney, had been engaged for the purpose by Davis' son at his direction, and he, Low, had been so advised by Davis, who had been a client of the Wise firm. Davis testified that Low was told of the Wise retainer on an earlier visit; that Low returned two or three days later, asked Davis for permission to see Wise, which was not given, and after a telephone call out of Davis' presence Low told Davis he was "making a mistake," referred to Frankel as a good lawyer, and said that if Wise wanted the pictures he, Low, had taken, "he will pay darned good for them." He displayed newspaper items and pictures of a group in attendance at a banquet and identified one of the group as Frankel, the lawyer he would have Davis retain. Low admitted he recommended Frankel. He said Davis asked for his opinion of Wise, and he replied he was a good attorney but "there were others that I personally preferred," and he named Frankel as one. But Low did call on Wise and told him he had seen Davis at the hospital and he could get the case for him if he would purchase the photographs. Wise replied that he

had already been retained; and he refused to buy the photographs.

Low paid a visit to John Schaible at his home in Keansburg, where he was confined following hospital treatment for injuries suffered in a highway accident, and told him, Schaible testified, "that he has come in contact with a lot of these cases and he has a friend of his that he works for and he would recommend him very highly; that the man is in a very good job—he is a Prosecutor—and that he could do the best for me as far as legal advice was concerned." He wrote down Frankel's name. He told Schaible of pictures he had taken and their evidential value, but he made no offer to sell them. Low admitted the call, but said: "I don't recollect what went on." He then agreed it was "quite possible" he did recommend a lawyer to Schaible. He did not recall an offer to sell the photographs.

There were other instances of the same pattern, all indicating the use of the photographs as a means of obtaining a retainer for the respondent. His endeavors in this direction are not denied. Insisting that the photographs were for sale to any one who wanted them, he admitted that on occasion he refused to sell such photographs to lawyers other than Frankel.

In his formal answer to the charges the respondent averred that he had paid to Low, "on various dates between December 23, 1952 and December 14, 1953, compensation for *bona fide*, substantial and valuable investigation services rendered by the said Low, at a rate approximating 25% of the net fee received by the respondent for legal services in each case in which the said Low rendered such investigation services," a "method and rate" of compensation for "investigation services in legitimate aid of the respondent's legal services to his respective clients" that "is a common and accepted practice in Monmouth County among lawyers and investigators," and "is not a division of legal fees with a layman such as is condemned by *Canon 34*"; and he maintained that the payments were not made "with any purpose or understanding that they were to encourage or induce the said Low to bring

and to influence the bringing of negligence cases arising from and out of automobile cases to the respondent, and were not in violation of *Canon* 28." The allegation of a common practice was abandoned at the hearing.

█ We are clear, as was Judge Drenk, that the payments thus made by Frankel to Low were not for "investigation services," but rather as "pay or reward" for the successful solicitation of negligence cases for respondent, pursuant to an arrangement to that end in disregard of the cited canons of professional ethics.

In 1953 Frankel paid Low $6,303.53. Low conceded that his gross yearly income never exceeded $8,000; his yearly average would be about $5,000. His first check from Frankel came July 3, 1951, for $100. Prior to 1951 Low's gross annual income ran between $2,500 and $2,700, and in 1951 or 1952 he began to "hit $5,000," indicating that Frankel was the major source of his income. The contention is that it was "entirely legal and ethical" for the respondent to "hire Low's services as an investigator, and to pay him, after recovery, a maximum compensation approximating 25%" of respondent's "net fee."

But Low was certainly a solicitor of negligence cases for Frankel, and the evidence is equally clear and convincing, beyond any doubt founded in reason, that Low rendered no investigatory services which would account for the payments made by Frankel. Counsel directs attention to the testimony of Frankel and Low that the latter "performed an actual, *bona fide* investigation in each case in which a check was issued to him for such services"; and it is insisted that "Express testimony cannot be rejected on the sole ground of its improbability," citing *Rains v. Rains,* 127 *N. J. Eq.* 328 (*E. & A.* 1940), and "Its impossibility alone can discredit the witness," citing *Berckmans v. Berckmans,* 16 *N. J. Eq.* 122 (*Ch.* 1863), affirmed 17 *N. J. Eq.* 453 (*E. & A.* 1864). It is said in argument that the burden of proof rests upon the prosecutor of the charges, and disbelief of the testimony of Frankel and Low in this regard "will not support an affirmative finding that the reverse of that testimony is true,"

and "Disbelief in testimony concerning particular facts does not convert that testimony into affirmative proof of contrary facts," citing *Eckenrode v. Pennsylvania R. Co.*, 164 *F. 2d* 996 (3 *Cir.* 1947), affirmed 335 *U. S.* 329, 69 *S. Ct.* 91, 93 *L. Ed.* 41 (1948); *State v. Poplowski*, 104 *Conn.* 493, 133 *A.* 671 (*Sup. Ct. Err.* 1926).

The principle is not apposite here. The charges may be proved by direct or circumstantial evidence; and the question is whether the evidence satisfies the standard of persuasion. Does it have the quality of belief or conviction constituting the legal measure of persuasion? As Judge Drenk found, "other than Frankel's and Low's testimony not one bit of evidence was adduced on behalf of the respondent to corroborate the alleged fact that Low performed investigating services; not one statement of a witness taken by Low, no memorandum of any report made by Low, no police or other agency report secured by Low, no name of a witness or fact discovered by Low was ever offered; not one client or witness was produced to testify that Low had interviewed him or her." There is no tangible evidence of the investigation of a single case by Low—a singular deficiency of proof that goes far to negative the tendered hypothesis. But conclusive in itself, when viewed in the context of the circumstances, is the payment to Low of 25% of the net fee received by Frankel for legal services in the given case, less the initial payment of $40, ostensibly for photographs taken, irrespective of the *quantum* of the service given or the expense incurred, and no compensation at all in cases in which no recovery was had. This standard of remuneration does not comport with the hypothesis of investigational service, varying as it would in time and effort according to the exigencies of the particular case, but rather betokens a sharing of the earned net legal fee on a fixed percentage basis for bringing the case to Frankel. This is clear beyond peradventure. The method of compensation is a distinctive symbol of the latter; it is in its very nature repugnant to the theory of recompense for purely investigational endeavors.

And these circumstances are also cited by Judge Drenk as plainly out of keeping with the assertion that the splitting of Frankel's net fee was merely to compensate for investigative service: The testimony of Frankel and Low that Low was not informed of the percentage formula of payment used by Frankel; in 1953, 75% of Low's gross income came from Frankel, while the remaining 25% represented Low's normal income before the arrangement with Frankel; Low rendered only a "verbal" bill for "investigations," but always a typed bill for photographs; Frankel paid Low from the outset one-quarter of his net fee for "investigations," even though Low had no previous experience as an investigator and, notwithstanding his inexperience, Low was not required to make written reports of his findings.

██ We are not concerned here with a claimed adverse inference from Frankel's omission to produce evidence peculiarly within his knowledge and control. See *Interstate Circuit, Inc. v. United States*, 306 *U. S.* 208, 59 *S. Ct.* 467, 83 *L. Ed.* 610 (1939); *Commercial Molasses Corp. v. New York Tank Barge Corp.*, 314 *U. S.* 104, 62 *S. Ct.* 156, 86 *L. Ed.* 89 (1941); also, 135 *A. L. R.* 1378; *Fritzler v. Keithley*, 143 *Neb.* 459, 9 *N. W. 2d* 794, 154 *A. L. R.* 573. *Frankel* acknowledges there is no record evidence to corroborate his own testimony that Low actually made case investigations for which he was recompensed by the payments at issue. And this is an important circumstance bearing on the nature of Frankel's relations with Low and the service for which Low was paid, a major factor in the assessment of the testimony of Frankel, an interested party, and of Low, an interested witness. There being no record proof of the claimed service, it is fairly inferable there was no such service, but rather that imported by the division of Frankel's net fee in the context of the particular circumstances. As Judge Wells said in *Rains v. Rains, supra*, the rule invoked by the respondent applies only where the uncontradicted testimony "is not contrary to circumstances in evidence, and contains no inherent improbabilites or contradictions which alone or in connection

with other circumstances in evidence excite suspicion as to the truth of the testimony. * * *" See *Schmidt v. Marconi Wireless Telegraph Company of America*, 86 *N. J. L.* 183 (*E. & A.* 1914); *Second National Bank of Hoboken, New Jersey v. Smith*, 91 *N. J. L.* 531 (*E. & A.* 1918). Frankel's appraisal of his relations with Low is not conclusive of the basic issue; his testimony is to be weighed in relation to all the circumstances and his own interest. There is in what he says the suggestion of rationalization obscuring the primary purpose of sharing the legal fee for Low's successful solicitation of the retainer.

The report made by Judge Drenk is confirmed.

■ We come now to the matter of discipline. The object of discipline, it was declared by the old Supreme Court, is not in essence punitive; the primary purpose is to determine whether the delinquent practitioner is unworthy of the trust and confidence basic to the relation of attorney and client. Has his conduct been such, in moral quality, as to make it evident that he cannot be entrusted with the duties and high responsibilities of the office of attorney? If there be moral unfitness, then no disciplinary measure short of disbarment will suffice; he should be ousted for the protection of the public and the honor of the profession. To warrant disbarment, the misconduct must be gross, and, short of a crime, it is requisite that it reveal moral turpitude. *In re Ries*, 131 *N. J. L.* 559 (*Sup. Ct.* 1944). See *In re P.*, 111 *N. J. L.* 569 (*Sup. Ct.* 1933).

Under the early rule in England, disbarment was deemed justifiable where the attorney had been fraudulently admitted, or convicted (after his admission) of felony, or other offense which rendered him "unfit to be continued an attorney," or knowingly suffered his name to be made use of by an unqualified person, or acted as agent of such person, or signed a fictitious name to a demurrer, as and for the signature of a barrister, or "otherwise grossly misbehaved himself." *Tidd's Pr.* 89. In 1778, Lord Mansfield said that the essential question is not one of punishment, but whether the offender "is an unfit person to practice as an attorney"; and for con-

viction of felony disbarment was ordered. *Ex parte Brounshall, Cowper,* 829 (1778).

■ This rule has had general acceptance in this country. Whether the delinquent attorney should be "disbarred or merely suspended for a period" calls for the exercise of a sound judicial discretion in relation to the particular circumstances; the "consequences of disbarment are so severe, both in degrading him in the eyes of the community and in depriving him of his means of livelihood that courts generally take that step only when the misconduct of the attorney may properly be characterized as gross, and in cases of lighter offenses or of a first delinquency, the minor punishment of suspension is usually inflicted." 5 *Am. Jur.* 413. See *Ex parte Wall,* 107 *U. S.* 265, 2 *S. Ct.* 569, 27 *L. Ed.* 552 (1883); *Ex parte Robinson,* 19 *Wall.* 505, 22 *L. Ed.* 205 (1874).

■■ The disciplinary discretion is to be reasonably exercised, "with moderation and caution," controlled by the basic consideration that the object is not punishment of the offender, but rather the disqualification in the public interest of a practitioner of the law who has been guilty of "misconduct, indicative of moral unfitness for the profession, whether it be professional or nonprofessional," such deficiency of character as would also sustain exclusion from the bar. *Grievance Committee of Hartford County Bar v. Broder,* 112 *Conn.* 263, 152 *A.* 292 (*Sup. Ct. Err.* 1930); *Grievance Committee of Bar of New Haven County v. Sinn,* 128 *Conn.* 419, 23 *A. 2d* 516 (*Sup. Ct. Err.* 1941). "The real question for determination in such proceedings is whether or not the attorney 'is a fit person to be longer allowed the privilege of being an attorney.'" *In re Durant,* 80 *Conn.* 140, 67 *A.* 497 (*Sup. Ct. Err.* 1907), citing *Fairfield County Bar v. Taylor,* 60 *Conn.* 11, 22 *A.* 441, 13 *L. R. A.* 767 (*Sup. Ct. Err.* 1891). See also *In re Paddock,* 114 *Vt.* 207, 42 *A. 2d* 342 (*Sup. Ct.* 1945); *In re Donaghy,* 402 *Ill.* 120, 83 *N. E. 2d* 560 (*Sup. Ct.* 1949). The fact that the disciplinary proceeding is the first of its kind under the *Canons,* and before, is an important circumstance to be considered in fixing the penalty.

*Smith v. State Bar of California,* 211 *Cal.* 249, 294 *P.* 1057, 73 *A. L. R.* 393 (*Sup. Ct.* 1930). See also 7 *C. J. S., Attorney and Client,* § 38, *p.* 806.

Our *Canons of Professional Ethics* came from the American Bar Association; and so we may well have recourse to the philosophy and administrative experience of the chairman of the Association's Standing Committee on Professional Ethics and Grievances, Mr. Henry S. Drinker, who has this to say in his recent work on *Legal Ethics* (1953), *p.* 46:

> "Ordinarily the occasion for disbarment should be the demonstration, by a continued course of conduct, of an attitude wholly inconsistent with the recognition of proper professional standards. Unless it is clear that the lawyer will never be one who should be at the bar, suspension is preferable. For isolated acts, censure, private or public, is more appropriate. Only where a single offense is of so gross a nature as to be impossible to a respectable lawyer, such as deliberate embezzlement, bribery of a juror or court official, or the like, should suspension or disbarment be imposed. Even here the lawyer should be given the benefit of every doubt, particularly where he has a professional record and reputation free from offenses like that charged."

Frankel's offense is classed by the canon itself as one justifying disbarment. It is accounted a serious transgression of the ethical principle that is the sworn obligation of every practitioner of the law, the more reprehensible and vicious because the solicitation is had through agents and runners. See *Chreste v. Commonwealth,* 171 *Ky.* 77, 186 *S. W.* 919 (*Ct. App.* 1916); *Drinker's Legal Ethics, p.* 28 *et seq.* Quite apart from its own inherent vice and its contaminating influence as a competitive factor, it is a practice that tends to corrupt the course of justice, and so the more abominable and evil in its incidence, although it is but fair to say there is no suggestion of that here.

Yet this is the first prosecution of its kind under the Canons, adopted by the original *Rule* 1:7–6, now *R. R.* 1:25; and we are not aware of a like proceeding in the years that had gone before. And the respondent has a professional reputation free from blemish otherwise. We think that in these circumstances the professional tradition and the public

good alike will be served by the suspension of the respondent from the practice of law for a period of two years, and until the further order of the court; and such will be the order. But this is not to be deemed by the bar a standard of action measuring the gravity of the offense. For such infractions in the future more drastic measures may be expected.

WILLIAM J. BRENNAN, JR., J. (dissenting). I differ with the majority only in that I think disbarment of the respondent is the single appropriate discipline in the circumstances in this case.

I.

The proceeding had its origin in a letter dated October 17, 1953 from Edward W. Wise, Jr., Esq., a member of the Monmouth County Bar, to the Administrative Director of the Courts. The letter detailed the activities of the photographer Low but did not mention respondent or any other lawyer "because (said Mr. Wise) I am not sure the attorneys involved fully realize what this man is doing."

The court on November 17, 1953 directed an inquiry by the Monmouth County Ethics and Grievance Committee as then constituted. The committee heard a number of witnesses, several of whom named respondent as the lawyer to whom Low sought to direct the cases which he solicited. No other lawyer was named by the witnesses in that connection.

The committee filed its report with the court on April 15, 1954. As to Low, the committee's conclusion was that "It does not appear to be the duty of this Committee to take further action but rather that Low's conduct be referred to the proper law enforcement agencies." As to respondent, the report states, "Realizing Mr. Frankel's standing as a member of the Monmouth County Bar, the Committee is prone to believe his statement that the acts of solicitation of Mr. Low were entirely without Mr. Frankel's knowledge." The "statement" mentioned was made by respondent to the committee on February 26, 1954. The transcript of that date

discloses that the committee made available to the respondent the transcripts of the testimony of the witnesses who had been heard and invited him to make such statement as he desired. He was not sworn before he made his statement, and why he was not does not appear. He denied having any arrangement with Low and said that he merely purchased pictures from him and at times employed him to investigate cases. He offered to answer questions, but no member of the committee asked him any. This was most unfortunate in the light of subsequent events, for had questions been asked of him it is possible that respondent would have disclosed to the committee, as he did before Judge Drenk later, that he had paid large sums to Low under a contingent arrangement. In such case I am confident that the committee would not have reported to this court that no further inquiry into respondent's conduct was required. And it may reasonably be concluded also that in light of the provision of *Canon* 28 expressly enjoining that "a duty to the public and to the profession devolves upon every member of the Bar having knowledge of such practices upon the part of any practitioner immediately to inform thereof, to the end that the offender may be disbarred," the committee would then have seen the unsoundness of their report that "The Committee finds, and regrettably so, that the attorney who instigated this investigation has been somewhat careless in the charges made."

Service upon the ethics and grievance committee is concededly not always an easy service. But it is service by special designation of this court required to aid the court in the proper discharge of the constitutional duty exclusively assigned to this court to discipline members of the bar who transgress our professional code. The final decision is this court's alone to make, but the situations calling for performance of this hard task are ordinarily made known to us only as they are revealed by the bar, and through the ethics and grievance committees are courageously and impartially presented. Mr. Robert T. McCracken, distinguished former chairman of the American Bar Association Committee

on Legal Ethics, in his article, *The Maintenance of Professional Standards: Duty and Obligation of the Courts*, 29 *So. Cal. L. Rev.* 65, 72 (1955), said:

"It thus appears that the responsibility for the initiation and conduct of disciplinary proceedings is shared about equally by the bar and the courts. Practically all such proceedings are started by the bar. All of them end up in the hands of the courts. Neither group can avoid the responsibility; neither group should attempt to do so. But there is a natural reluctance on the part of lawyers, even acting in committee, to attack the conduct of other lawyers. They are all members of the same craft. Ofttimes they are members of the same local bar. They are in constant contact with one another. They may belong to the same clubs, legal or social, or both. They may even dine with one another. They have frequently granted favors to one another, appropriately, of course, in the conduct of their profession. They anticipate meeting one another professionally, and perhaps socially, in the years ahead. They are often under pressure from close friends of the offending lawyer to refrain from taking action. These and other elements enter into the problem presented when an accusation is made against a member of the bar and is under consideration by the grievance committee or other body to examine into it."

The performance of the ethics and grievance committees of this State has been predominantly gratifying. There is evidence in abundance in the work of our ethics and grievance committees of the truth of Mr. McCracken's observation that,—

"Yet the committee rarely fails to perform its duty. A high sense of obligation to the profession, the necessity for maintaining its standards, and a responsibility to the public which it serves eventually overcomes any reluctance which may be manifest when the task is first presented. Long hours, days and even weeks are consumed by members of the examining group in sifting the evidence in order to arrive at a just determination as to the course to be followed. If a trial be had, it requires preparation of the first order and courageous presentation of a highly unpleasant situation.
\* \* \* on the whole, \* \* \*, complaints are handled with energy and impartiality."

The committees will, I think, concede that difficult and unpleasant as their task may be it pales by comparison with our own. The members of this court are also lawyers, and it

is a rare disciplinary case that involves a lawyer unknown to some of us. Usually he has been a fellow practitioner of one or more of us and not infrequently a friend. But, as a former President of the United States has said as to the responsibilities of that office, "The buck stops here"; ours is the final word and when we give it expression we are all too painfully conscious that, stating it, we are often ending a lawyer's career.

There can be no disagreement with the postulate that the attitude toward charges of professional misconduct against a lawyer must be attended by the same professional objectivity which marks the handling of clients' affairs.

The true purpose and function of disciplinary proceedings must ever be kept uppermost in mind. Discipline is not imposed to punish the lawyer who transgresses. It is imposed in order that the public shall have continued confidence that the profession will purge itself of lawyers unable or unwilling to measure up to the high standards of honor and moral decency by which we govern our professional conduct—and that we will do so, not to enhance our own self-esteem, but solely to further the end that public respect for the purity of the administration of justice shall not waver or diminish. That respect is a first essential of a democracy; the confidence of the people in the administration of justice is a prime requisite for free representative government. It would be tragic indeed if that confidence and respect should be lost out of public suspicion, be it ever so slight, that the profession cannot be counted upon courageously to rid its ranks of those who by their serious misconduct demonstrate their contempt for the professional ideals which earn that respect and confidence for us.

As Mr. McCracken aptly noted, *page 73*:

"* * * there seems to persist a strange confusion as to the nature of disciplinary proceedings. Over and over the courts have stated that the end and purpose of such proceedings, particularly where disbarment is under consideration, is not punishment of the offender, but protection of the public."

and, at *page* 75 :

"* * * Protection of the public, and nothing else, lies at the basis of this thinking. It is submitted that this doctrine is the sole justification for discipline of a lawyer for actions other than contempt of court."

This has always been the settled concept of the function of disciplinary proceedings: "to remove from the profession a person whose misconduct has proved him unfit to be entrusted with the duties and responsibilities belonging to the office of attorney, and thus protect the public and those charged with the administration of justice," 5 *Am. Jur.*, *Attorneys at Law, sec.* 249; "to secure respect for the judicial process and to protect the public at large from practitioners who are unable or unwilling to uphold the ethical standards of the profession," 5 *Ark. L. Rev.* 411, 412 (1951); "the purpose of the disbarment proceeding is not to punish the lawyer, but rather to protect the court itself and relieve the public of a member of the legal profession who is unfit to serve as such, in order to maintain the respect due the court by insuring that attorneys who are officers of the court are of good professional character," 7 *Vanderbilt L. Rev.* 677, 691 (1954); and see *People ex rel. Chicago Bar Ass'n v. Baker*, 311 *Ill.* 66, 142 *N. E.* 554, 31 *A. L. R.* 737 (*Sup. Ct.* 1924), *In re Williams*, 221 *Minn.* 554, 23 *N. W. 2d* 4 (*Sup. Ct.* 1946), *In re Haddad*, 106 *Vt.* 322, 173 *A.* 103 (*Sup. Ct.* 1934), *In re Beakley*, 6 *Wash. 2d* 410, 107 *P. 2d* 1097 (*Sup. Ct.* 1940).

Our profession fully acknowledges that the public has a vital stake which gives it the right to demand vigilant and courageous action from the profession in ridding itself of those whose serious misconduct has demonstrated their unfitness to be allowed to practice law any longer. The sacred mission entrusted by the public to the profession to deal with the vital affairs that affect the whole pattern of human relations is reason enough that the public should insist that only those loyal and devoted to the high moral and ethical standards by which we guide our labors shall be deemed worthy

604

by us to share the high privilege of discharging that sacred trust. Granted that the termination of a lawyer's career is a lamentable business for those who have that hard assignment, we cannot falter when duty points that path as essential to the administration of justice in the public interest. Judge Hyde has pertinently noted, 29 *So. Cal. L. Rev.* 82–83 (1955):

"* * * the public usually judges professional standards by the actions of the individual lawyers they know. The profession can hardly rise above the level of those of whom it is composed and improper conduct of any of its members brings that level lower in the public view. Thus, improper conduct of even a very few individuals lowers the prestige of the profession in much greater proportion than the number of those guilty of misconduct bears to the entire membership of the profession. Such misconduct also lowers the respect of the public for the courts and has harmful effects upon the entire judicial system."

So it is that the people of New Jersey constitutionally cast upon this court the power exclusively to determine the discipline to be imposed. *Const.* 1947, *Art.* VI, *Sec.* II, *par.* 3. This was done with justified confidence that the power would be exercised with the public interest primarily in mind, to protect the public from lawyers who demonstrate their inability to distinguish their obligation to serve the public from their private personal interests, to the damage of the courts and the commonweal.

Respondent's offense, as I shall demonstrate more fully later, is of a most grievous nature, wholly inimical to the public interest, and because of the feature of the contingent arrangement, not only, as said by the majority, "classed by the Canon itself as one justifying disbarment" (significantly, the only offense as to which the Canons expressly mention disbarment), but one for which other states have had little hesitancy in decreeing disbarment. The breeding of litigation through use of lay runners compensated by payment of a sum contingent upon the recovery is an evil so vicious and so fraught with danger to the public interest that it has been classified as unprofessional conduct involving moral turpi-

tude. 16 *Ohio State L. J.* 114 (1954). In *Chreste v. Commonwealth,* 171 *Ky.* 77, 97, 186 *S. W.* 919, 926 (*Ct. App.* 1916), cited in the majority opinion, it was pointed out that there is "a very wide difference between the unprofessional and undignified practice of personal solicitation of business and the indefensible and vicious practice of employing agents and runners who are not lawyers to go about the country soliciting business and stirring up strife and litigation for a stipulated consideration or a contingent fee," and the offending lawyer was subsequently disbarred, 178 *Ky.* 311, 198 *S. W.* 929 (*Ct. App.* 1917). For other phases of that case see *Chreste v. Louisville Ry. Co.,* 167 *Ky.* 75, 180 *S. W.* 49, *L. R. A.* 1917 *B,* 1123 (*Ct. App.* 1915); *Id.,* 173 *Ky.* 486, 191 *S. W.* 265 (*Ct. App.* 1917). And the contingent contract between respondent and Low was contrary to the public policy of this State, *Ready v. National State Bank of Newark,* 117 *N. J. L.* 554 (*E. & A.* 1937); *Peraino v. De Mayo,* 13 *N. J. Misc.* 233 (*C. P.* 1935), because in violation of *N. J. S. A.* 2A:170–83 denominating as a disorderly person anyone "who solicits * * * any suit for damages in which the person soliciting * * * by agreement * * * receives from the person solicited * * * or his attorney, any compensation dependent upon the amount of the recovery in any such suit"; see also *N. J. S. A.* 2A:170–85.

Yet respondent's disbarment is not directed. The majority opinion finds that militating against disbarment are the considerations that "this is the first prosecution of its kind under the *Canons*" and that "the respondent has a professional reputation free from blemish otherwise." The "gravity of the offense" is conceded, and presumably will be deemed to warrant disbarment in the case of any lawyer hereafter guilty of similar misconduct, since it is said, "For such infractions in the future more drastic measures may be expected." But respondent's misconduct, involving as it did the acceptance from Low of some 53 cases over a period of 2½ years from July 1951 to January 1954, and the payment to Low therefor of $7,363.69, falls unquestionably into Mr. Drinker's category of "the demonstration [implacably re-

quiring disbarment] by a continued course of conduct, of an attitude wholly inconsistent with the recognition of proper professional standards," *Drinker, Legal Ethics* (1953), *p.* 46. And note Mr. Drinker's apparent agreement, at *page* 29, with the disbarment ordered in the *Chreste* case. In the circumstance of our unanimous finding that respondent engaged in this serious misconduct, the public interest requires, as I see it, a concrete demonstration, now, in this case, and not, perhaps, in some future case, of our will to deal with this misconduct as it deserves to be dealt with.

And I fail to see how respondent's misconduct was the less reprehensible because carried on under the cover of a good reputation and the general esteem of the community. Logically, the contrary inference is indicated. *In re Clark*, 184 *N. Y.* 222, 77 *N. E.* 1 (*Ct. App.* 1906).

## II.

Returning for the moment to the chronology of events here, the committee's report, on the face of it, required further proceedings only as to Low. The court accordingly referred the matter to the May 1954 term, Monmouth County grand jury, for further inquiry. The grand jury heard the same witnesses who testified before the committee, and Low as well. Respondent did not appear before the grand jury, and we are not informed whether or not he was requested to or whether he himself sought to appear. The grand jury concluded its deliberations with the filing of a presentment on September 21, 1954. But for that presentment the occasion for further inquiry into respondent's conduct might not have appeared. The presentment brought about the court's decision to adopt the unusual procedure of appointing Judge Drenk to investigate the matter and designating Mr. Fisher to aid him. It was in the proceeding before Judge Drenk that the evidence was first obtained from the respondent of his true relationship with Low and of the contingent arrangement he had and the sums paid thereunder. The grand jury's presentment was forthright in its expression that

"This grand jury criticizes and condemns with all the severity at its command the improper practice of any photographer in seeking to influence injured persons or the representatives of deceased persons to retain the services of any attorney or attorneys. With equal severity we condemn any lawyer or lawyers who may encourage a photographer so to do."

This lay appraisal of respondent's conduct, particularly since it was made without benefit of the facts as to the true arrangement with Low and the large sums paid by respondent to him, is more than a straw revealing the direction of the wind of public sentiment. The presentment strongly implies that the grand jury would have dealt with the matter directly except that it was (quite accurately) "advised that should it find any evidence indicating complicity on the part of any lawyer or lawyers in the complained-of practices that it has no jurisdiction to hand up an indictment in the matter since that offense is one to be dealt with exclusively by the Supreme Court of this state." To that end the recommendation was made that the transcript of testimony be filed with the Administrative Director of the Courts, evincing, as clearly as it was within the power of the grand jury to do, its conviction that the case was of serious import requiring action on our part appropriate to the offense if established to have been committed.

## III.

I do not think we can fail to emphasize the seriousness of the offense committed by the respondent. In the vernacular, it is "ambulance chasing," although in this instance the effectiveness of Low's service was due to his ability to get to the scene of the accident even before the ambulance arrived. Three decades ago this pernicious practice was rampant in many sections of the country and led to numerous investigations which, for a time at least, cleansed the profession of a number of practitioners guilty of the most flagrant abuses. By and large this was an action of the organized bar. Many at our own bar will recall similar investigations in several of our counties. See *In re Bar Ass'n of Hudson County*, 109 *N. J. L.* 275 (*Sup. Ct.* 1932).

Informative studies of the vicious effects upon the public of misconduct of the sort practiced by the respondent and the consequent deterioration of respect for the courts and the bar will be found in Mr. Justice Wasservogel's report to the New York Appellate Division, First Judicial Department, and Mr. Justice Faber's report to that court, Second Judicial Department, *New York Legislative Documents, 152d Sess. 1929, vol. 18, No. 52, pages 7* and 31. The results of the Milwaukee, Wisconsin, inquiry are found in Judge Aaron's article in 14 *Marquette L. Rev.* 1 (1929) and Mr. Holmes' article in 12 *Marquette L. Rev.* 193 (1928). See also *Nationwide War on "Ambulance Chasers," 14 A. B. A. Journal* 561 (1928).

The investigations revealed a common pattern of abuses incident to every disclosed practice, as here, of inducing the solicitor to get cases for the attorneys upon payment therefor, whether by a flat fee for each case solicited, *Matter of Vail,* 228 *App. Div.* 217, 220, 239 *N. Y. S.* 414, 418 (*App. Div.* 1930), a fee contingent upon the amount of recovery, *Matter of Littick,* 225 *App. Div.* 246, 232 *N. Y. S.* 571 (*App. Div.* 1929), or a straight salary, *Matter of Schacht,* 228 *App. Div.* 232, 239, 239 *N. Y. S.* 516 (*App. Div.* 1930). Clients' interests quickly suffered; both lawyer and solicitor were motivated not by what was best for the client but how best to make the "business" as lucrative as possible. If the case proved not to be of great value, the disposition was to settle for any amount obtainable, or ignore the case entirely, to give more time for more lucrative ones. The solicitor's demands, particularly if his arrangement, as here, was on a contingent basis, put pressure on the lawyer to charge exorbitant fees. Group settlements with insurance carriers became common, a practice taking the form of "lump sum settlements" of a number of cases without breakdown according to the individual merit of each. The competition among solicitors became so keen that disgraceful imposition upon persons *in extremis* from injuries became common. Court calendars became congested with cases brought, not to achieve justice for the litigant (indeed often the case was brought

without his knowledge), but to force settlements. Perjury and the manufacture of evidence became rife as the solicitor, often with the knowledge of the lawyer, would adopt any expedient required to give the appearance of an actionable claim. And the tendency was noted of the practice, left unchecked, to increase and perpetuate itself. *State v. Kiefer,* 197 *Wis.* 524, 529, 222 *N. W.* 795, 796–797 (*Sup. Ct.* 1929). A valuable note dealing with these several consequences of this brand of ambulance chasing will be found in 30 *N. Y. Univ. L. Rev.* 182 (1955) ; see also 7 *Vanderbilt L. Rev.* 677 (1954).

An appalling summary of the abuses to be apprehended from the practice engaged in by respondent with Low appears in the *Report of the Special Committee on Professional Abuses in Accident Litigation* submitted in 1929 by a distinguished committee, of which Mr. Henry S. Drinker, Jr., was chairman. It is interesting that many of the devices employed by the solicitors at that time are identical with many testified to as having been practiced by Low in the instant matter. The Report states :

"The paid solicitors—known as runners—employed by the attorneys engaged in this practice, are usually unscrupulous men of a low type and are known to be such by the lawyers who employ them, although such lawyers always cultivate a deliberate ignorance of their activities. They employ all sorts of ingenious subterfuges to entrap and excite the cupidity of their credulous and ignorant prospects. Most of them carry around newspaper accounts of the large verdicts which their employers have obtained, with photostat facsimiles of large checks which have been paid by them to clients in totally unrelated cases, creating by the exhibition thereof to their prospects the improper inference that similar results will be forthcoming in the solicited case. With no accurate knowledge of the legal possibilities of the case, and in disregard of what little knowledge they in fact have, they habitually promise results far in excess of any for which the sanguine lawyer could hope. Nor do they hesitate to disparage or defame any other attorney whom the prospective client may have in mind or whom he may have already retained.

Many of the lawyers actively engaged in the practice of soliciting accident claims, continue such practices against their real desires to refrain therefrom, particularly those with estalished reputations for efficiency in handling such litigation, knowing that so long as

the Bar and the courts allow their competitors to engage in such practices, they must themselves employ them or lose all their business.

Side by side with the ambulance chasing lawyers there always develops a group of so-called independent adjusters, not members of the Bar. These men, who may be termed runners-at-large, make a business of searching out accident claimants and securing powers of attorney to settle their claims, those which they are unable to settle they peddle among the accident lawyers at the highest price obtainable. Their tendency to frame fake claims is unrestrained by fear of disbarment. Their desire to avoid splitting their compensation with a lawyer often leads them to settle sound claims to the great disadvantage of the 'client.'

Such organized solicitation of accident claims, conducted by such type men, inevitably results in the manufacture of fake claims, in the gross exaggeration of scratches and bruises to the appearance of major injuries, and in the fraudulent attempt to attribute real injuries or ailments to accidents which really had no causal relation to them—all by means of perjured testimony, usually in collusion with one or more of a class of physicians who make a practice, for a contingent compensation, of giving such expert testimony as will meet the necessities of the case.

As a result of the multiplication of accident claims, real as well as fabricated, the court calendars have become so congested as very seriously to interfere with the effective administration of justice. Innumerable accident cases are instituted and placed by the ambulance chasers on the court lists with no expectation of bringing them to trial, but merely in the hope of effecting a small settlement on a nuisance value basis, or in many cases to advertise themselves as extensively engaged in the trial of such cases."

But the salutary results achieved in that day in curtailing or eliminating the practice have unfortunately proved to be short-lived. Mr. Drinker notes, at *page* 64 of his work:

"The practice of 'ambulance chasing' is so well known and so obviously improper as to require no extensive comment. It is most prevalent in large communities, and comprehensive investigations and drives to stamp it out have been held, with more or less success, usually but temporary, in many such jurisdictions."

A resurgence of chasing is now appearing, sufficiently so that at the 1954 meeting of the House of Delegates of the American Bar Association, the Committee on Professional Ethics and Grievances adopted a resolution calling for the appointment of a special committee to study the "personal injury damage suit racket," 30 *N. Y. Univ. L. Rev., supra,*

*p.* 182. Popular magazines are taking note of the existence of the problem. See *Readers Digest,* January 1955, *The Personal Injury Racket—How Shysters Cost the American People Millions through Phony Law Suits.* The *August* 1955 *Report of the Special Committee on Investigation, Solicitation and Handling of Personal Injury Claims* (the Committee was created by Resolution found in 79 *A. B. A. Reports* 153 (1954)), reported that from "the almost unbelievable amount of data and correspondence" submitted to it the committee found reason to recommend that its work be continued with an enlarged membership.

The majority opinion shares my view that "Quite apart from its own inherent vice and its contaminating influence as a competitive factor, it is a practice that tends to corrupt the course of justice, and so the more abominable and evil in its incidence." The sentence concludes, however, "although it is but fair to say there is no suggestion of that here." I submit that in the light of the studies of the abuses found always to attend the practice we are not justified in assuming that this is the exceptional case because there were no affirmative proofs that some of the abuses were not also concomitants of respondent's misconduct. Moreover, I do not see how we can fail to be uneasy about the allegation of respondent's answer that his arrangement for compensating Low "at a rate approximating 25% of the net fee received by respondent for legal services in each case in which the said Low rendered such investigation services * * * is a common and accepted practice in Monmouth County among lawyers and investigators, and is not a division of legal fees with a layman such as is condemned by Cannon 34 * * *." The allegation was withdrawn at the hearing and it is not clear what respondent intended to imply by it. *Canon* 34 proscribes such an arrangement even if in fact Low's service had been entirely in the investigation of cases.

I may sum up my position as believing that the evils almost certain to follow from any equivocation on our part with misconduct of this sort portend such possibility of scandal and contempt for the judicial system, and prejudice, imposi-

tion upon or injury to the public, that we should not hesitate clearly and unequivocally here and now to make clear our stand that lawyers guilty of it are deemed to be grossly improper persons to participate in the administration of the laws and will be disbarred. In my view, any other result is at odds with the fundamental truth expressed in the eloquent words of the Preamble to the *Canons*:

"In America, where the stability of Courts and of all departments of government rests upon the approval of the people, it is peculiarly essential that the system for establishing and dispensing Justice be developed to a high point of efficiency and so maintained that the public shall have absolute confidence in the integrity and impartiality of its administration. The future of the Republic, to a great extent, depends upon our maintenance of Justice pure and unsullied. *It cannot be so maintained unless the conduct and the motives of the members of our profession are such as to merit the approval of all just men.*" (Emphasis supplied)

## IV.

An additional consideration, not adverted to in the majority opinion, seems to me also to have a bearing upon the discipline appropriate to respondent's misconduct.

Threaded through the *Canons of Professional Ethics* is emphasis upon candor in the lawyer's relations with the courts as a prime hallmark of the ethical practitioner. *Canon 22* expressly enjoins that "The conduct of the lawyer before the Court and with other lawyers should be characterized by candor and fairness."

A disciplinary proceeding is a judicial proceeding. *Toft v. Ketchum*, 18 *N. J.* 280, 284 (1955). I can conceive of no judicial proceeding calling for a fuller discharge of the obligation of candor and fairness than when one's own professional conduct is under review.

Yet respondent's actions in this case were characterized by neither candor nor fairness with either the court or his fellow lawyers of the ethics and grievance committee. He not only made no mention whatever of the large sums paid to Low when he appeared before the committee, but furthermore, when finally forced to develop the details before Judge

Drenk, he described the arrangement as merely one for the purchase of pictures and for investigation work, a characterization which we have unanimously found must be rejected in favor of the finding that actually the arrangement was one to compensate Low for cases chased by him.

I cannot escape the conclusion that such conduct is, not only properly, but necessarily, to be considered when determining the discipline appropriate to the offense which occasioned the proceeding.

The Chief Justice joins in this dissent.

WACHENFELD, J. (concurring in the result). Many judges I know have little zeal or ardor in the infliction of punishment in disciplinary matters. I have the same difficulty, and although my judgment varies with the circumstances, yet I doubt if I have "faltered" in my duty.

I cannot subscribe to a pronouncement by this court as to what we shall do in future cases without knowledge of the facts, nor am I much concerned with the vehement and superlative castigations made by others in this field of endeavor.

The punishment meted out, from my view, must be in accord with the humble dictates of my own conscience and not theirs.

"Be merciful as well as just" is an admonition I have long revered. It too may have a place in the disciplinary field, and the opinions written in this case have not prevailed upon me to discard it.

I record myself only with the result of the majority.

*For suspension for two years*—Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—5.

*For disbarment*—Chief Justice VANDERBILT and Justice BRENNAN—2.