In re F. Leland JONES.

No. 47788.

Supreme Court of Missouri,
En Banc.

Jan. 10, 1966.

Rehearing Denied Feb. 14, 1966.

Certiorari Denied Oct. 10, 1966.
See 87 S.Ct. 126.

Guilfoil, Caruthers, Symington, Montrey
& Petzall, Rexford H. Caruthers, St. Louis,
for F. Leland Jones.

William H. Billings, Flake L. McHaney, Kennett, for Missouri Bar Advisory Committee.

DONNELLY, Judge.

This is a disciplinary proceeding against F. Leland Jones, a member of the Bar of Missouri.

On July 22, 1959, the Advisory Committee of the Missouri Bar filed an Information in this Court in substance charging that F. Leland Jones, during the period of February, 1956, to and including June 1, 1958, employed, utilized, benefited from and accepted the services of one Walter G. Candy of Cincinnati, Ohio, a layman, to seek out, influence and solicit persons with claims for personal injuries or wrongful death under the Federal Employers' Liability Act for the purpose of securing such persons as clients, and that Jones did directly and indirectly pay and reward Candy for doing so, all in violation of the Rules of the Supreme Court of Missouri; that Jones, in order to circumvent the Rules of the Supreme Court of Missouri, with respect to the solicitation of claims by Candy, did willfully, wrongfully and unprofessionally "set up, operate and take part" in a deliberate plan, scheme and subterfuge in that Candy solicited said claims purportedly as an investigator and, by agreement with Jones, had the person whose claim was solicited write a letter requesting an interview with Jones for the purpose of employing Jones in a professional capacity concerning such person's claim, when in fact said "investigative plan" and said "letter" constituted a willful and deliberate facade to conceal the true facts, i. e., that Candy was soliciting, chasing and running claims for Jones, in the event a Bar investigation ensued.

It was charged that sometime during the year 1956 Candy solicited and procured for Jones the claims and lawsuits of George Shuler, M. L. Crutchfield, Jack Hubbard, George Morgan Spears, Paul D. Pratt, Lee Addison, Carlos B. Redden, and the heirs of Donald G. Bruce; and that Jones thereby violated Rules 4.27 and 4.28, V.A.M.R. of the Missouri Supreme Court in that he (1) solicited law business by personal communication or interviews and (2) employed a lay agent and runner for like purposes.

F. Leland Jones, for his answer to the charges, admitted that during the last eight months of 1956 Candy recommended to Shuler, Crutchfield, Hubbard, Spears, Pratt, Addison, Redden and the Bruce heirs that they consult Jones with respect to professional employment, and that said persons did consult him and thereafter employed him and his law firm to represent them concerning their respective claims, but Jones denied that such recommendations and employment constituted or resulted from a deliberate plan, scheme and subterfuge by which he employed, utilized, benefited from and accepted the services of a layman in soliciting personal injury claims and by which he paid and rewarded said layman in violation of the Rules of the Supreme Court of Missouri. Jones further affirmatively stated that prior to and during the period of time when Candy recommended personal injury clients, Jones and his partners had the good faith belief that such recommendations were not in violation of the Rules of the Supreme Court of Missouri, and stated facts evidencing such alleged good faith. Jones further averred that, although Candy recommended to the clients mentioned above that each consult Jones and his firm regarding professional employment, Candy did not do so as an agent and runner for Jones and his firm.

This Court, on January 11, 1960, appointed Ronald L. Somerville, of the Livingston County Bar, as Special Commissioner to take testimony, make findings and conclusions and report to this Court. A total of fifty days of hearings were conducted resulting in more than 4,000 pages of transcript and countless exhibits.

The Commissioner, in his report, treats Candy as follows:

"The Commissioner is quite candid and forthright in stating that the overall per-

sonality and character of Walter G. Candy was quite distasteful and repelling. It is inconceivable that any person with human instincts would react otherwise. The aforementioned, in conjunction with numerous contradictions, self-admitted lies and perjury contained in Walter G. Candy's testimony at the outset of the hearing, since Walter G. Candy was the first witness produced, placed the hearing before the Commissioner, initially, as well as the overall record in the case, in a difficult and adverse posture. Moreover, the aforementioned undoubtedly placed extremely heavy burdens upon both Informants and Respondent concerning the orderly presentation of their respective positions in said cause. The Commissioner wishes to emphatically and clearly state that he does not, directly or indirectly, level any criticism towards either Informants or Respondent in respect to the matters just mentioned. However, the Commissioner feels that in ultimate fairness to all concerned in these proceedings that the court should be aware of the extraordinary burden that all connected with this matter labored under. Regardless of Walter G. Candy's character and personality, his obvious determination to seek revenge against F. Leland Jones, and his complete and utter disregard and disrespect for the solemnity of the sworn oath, he was the individual whom F. Leland Jones was associated with during the period of time involved in the proceedings and he was, and is, therefore inextricably involved in the ultimate determination and disposition of the charges pending herein although, for reasons hereinafter assigned, his (Candy's) testimony is not considered in determining the charges."

The Commissioner, who was present at the hearings, and observed the witnesses, concluded that Candy's testimony was unworthy of belief. We agree. Since Candy's testimony is relied on for proof of the charge of "a deliberate plan, scheme and subterfuge," we hold for Jones on this segment of the case. The question concerning solicitation is another matter. All parties agree with the Commissioner's findings of basic fact. We borrow freely from his report in this regard.

F. Leland Jones was 38 years of age at the time he testified before the Commissioner; he was born in St. Louis, Missouri, on June 2, 1924. He attended the University of Denver, Denver, Colorado, on a scholastic scholarship, graduating from said institution in 1946. While attending the University of Denver he was initiated into the honorary scholastic fraternity of Phi Beta Kappa. After completing his undergraduate work at the University of Denver he attended Harvard Law School on a scholastic scholarship, graduating from said latter institution in 1949. In December of 1949, he was admitted to practice law in the State of Missouri.

Thereafter, he worked as an adjuster and for several law firms in St. Louis until the partnership of Gross, Jones and Blumenfeld was formed in St. Louis in 1955. At the hearings a Federal Judge, four Missouri Circuit Judges and eight lawyers and doctors testified to his good character, good judgment and above-average intelligence. At the hearings, Jones was cooperative and respectful and in all instances made his records and files available.

The initial contact between Jones and Candy occurred on October 27, 1955, in the Civil Courts Building in St. Louis, where Candy approached Jones about representing an injured friend. Nothing came of this conversation. Then, in January, 1956, Candy appeared in Jones' office in St. Louis to make inquiry as to whether the firm would employ Candy on a per diem basis to investigate railroad cases. Jones advised Candy that the firm would not employ Candy as an investigator with respect to any cases in which Candy recommended injured employees to the firm, since to do so might be looked upon as a payment to Candy for such recommendation. After several telephone calls, Jones and Candy met for a conference in Cincinnati, Ohio, on January 28, 1956. At this conference

Candy explained to Jones that he had an investigation contract form which he was going to execute with injured employees; that this contract form was in the nature of a contingent fee contract whereby Candy would investigate cases and then make the investigation file available. Candy inquired of Jones whether Jones would be interested in being recommended by Candy to injured employees from whom Candy obtained contingent fee contracts. Jones advised Candy that he at no time saw anybody unless he was first contacted by such person. Jones understood that under Candy's proposed mode of operation, he, Candy, was going to solicit injured people either by making direct contact with them or as a result of advertising Candy contemplated doing. Jones further knew that in the event he decided "to do business" with Candy that he, among others, would be recommended as an attorney by Candy to injured people with whom Candy had investigation contracts. At the conclusion of the conference, Jones advised Candy that he would discuss Candy's proposal with his partners.

Upon Jones' return to St. Louis from Cincinnati, his conference with Candy was the subject of a discussion or series of discussions with the other partners in the firm. The partners analyzed Candy's proposal, principally as to the point they were interested in, namely, if they were recommended by Candy to any of the persons with whom he had contingent fee investigation contracts, whether it would be proper for them to talk to such injured people. They analyzed the matter of whether or not it would be proper for Candy to recommend a lawyer to injured people with whom he had a contingent fee investigation contract. In this latter respect, the firm drew certain analogies:

(1) An analogy was drawn with respect to trust companies discussing trust matters with their clients and then recommending a lawyer to draft such instruments as were indicated;

(2) An analogy was drawn with respect to lawyers recommending physicians to clients;

(3) An analogy was drawn with respect to private investigators recommending lawyers to clients concerning defense matters.

The firm also analyzed the matter of honoring Candy's contract out of the settlement proceeds if the client authorized the same and they drew an analogy with respect to the payment of hospital bills and doctor bills out of settlement proceeds. As a result of the firm's discussion, it was concluded that Candy should come to St. Louis to further discuss the matter. Candy did in fact come to St. Louis on February 10, 1956.

At the February 10, 1956, meeting in St. Louis Candy was advised that the firm would be willing to talk to persons recommended by Candy and with whom Candy had a contingent fee investigation contract, provided the following conditions were observed:

(1) The firm would not see or make contact with any person unless said person first contacted the firm and said initial contact could either be by telephone, letter or a personal appearance at the firm's office;

(2) That the firm would not advance or loan any money to Candy for his business;

(3) That the firm would be one of several lawyers or firms recommended to persons in order that the person could have a choice among St. Louis lawyers and Candy was not to recommend the firm to any person who already had an established legal connection;

(4) Candy at no time was to interfere with the attorney-client relationship.

Candy was informed at this meeting that the firm would honor any contingent fee contracts that Candy had with a client, provided the client specifically authorized the

firm to so honor the contract. Jones testified that a failure to honor Candy's contract would have made Candy very unhappy, although Candy did not specifically advise the firm on February 10, 1956, that if it failed to honor his contracts he would not thereafter recommend them. Jones knew, as a result of the February 10, 1956, meeting with Candy, that Candy would be out soliciting claims of injured railroad employees in connection with his contingent fee investigation contracts.

During the year 1956, Walter Candy did in fact solicit the cases of and recommend Jones and his firm to George Shuler, M. L. Crutchfield, Jack Hubbard, George Morgan Spears, Paul D. Pratt, Lee Addison, Carlos B. Redden and the heirs of Donald Bruce, deceased, and Jones and his firm accepted employment from said persons. Candy had contingent fee investigation contracts with all of the aforementioned persons, which were honored by Jones. The particular facts as to each of these cases follow. All of the evidence detailed here was elicited from Jones or the client involved and not from Candy.

George Shuler of Cincinnati, Ohio, was injured on February 4, 1956, while working as an employee of the Baltimore and Ohio Railroad. During the latter part of March or the first part of April, 1956, Candy contacted Shuler by telephone concerning his claim; thereafter, Candy contacted Shuler at his home. When Candy contacted Shuler at his home he had a brief case full of checks concerning different cases he had worked on which he told Shuler he used to chase cases for different lawyers and for different railroaders. Shuler was aware at the time Candy contacted him that Candy was a "runner for injured employees." Candy advised Shuler that he was at that time a private investigator so that everything he did was on the up and up and nobody could do anything to him for chasing cases.

While at Shuler's home, Candy suggested and recommended to Shuler that he employ Jones as his attorney to handle his claim. Shuler had never heard of Jones before Candy came to see him and made no contact with Jones until after Candy had suggested that he do so. Shuler accepted Candy's recommendation and contacted Jones by long distance telephone. During the course of the telephone conversation between Shuler and Jones, Jones requested Shuler to write him a letter setting forth that he wanted to see Jones about his case. Shuler wrote the letter to Jones.

On April 30, 1956, Jones, accompanied by Candy, went to see Shuler at his home in Cincinnati. Jones secured an undated contract of employment from Shuler. Shuler had entered into a ten percent contingent fee investigation contract with Candy before Jones went to see Shuler. Shuler's case was settled for $17,500 a few days prior to December 16, 1957. Jones mailed a check for $1,750, made payable to George Shuler, direct to Candy and it was Shuler's recollection that he endorsed the check while at Jones' office.

Morris Crutchfield resided in Covington, Kentucky. On April 6, 1956, while employed by the Baltimore and Ohio Railroad, he was injured in Dayton, Ohio. He was hospitalized as a result of his injuries and when he was released from the hospital, around the early part of May, 1956, Walter Candy contacted him by telephone and advised him that he would like to personally talk to him. Candy went to Crutchfield's home and Crutchfield executed one of Candy's ten percent contingent fee investigation contracts. Candy recommended Jones to Crutchfield and suggested to Crutchfield that he write a letter to Jones requesting an appointment. Crutchfield had never heard of Jones prior to Candy's visit to Crutchfield's home and Jones was the first lawyer Candy recommended to Crutchfield.

Crutchfield called Jones at his office in St. Louis, Missouri, on May 4, 1956, at which time Jones advised Crutchfield to write him a letter. Crutchfield and Candy

went to Jones' office in St. Louis on May 7, 1956, at which time Jones conducted a preliminary interview with Crutchfield and at which time Jim Blumenfeld secured a detailed statement from Crutchfield, a portion of which reads as follows: "Mr. Crutchfield reports that he was contacted by Mr. Candy after he left the hospital. Mr. Candy impressed him with the capabilities of Mr. Jones and sent him in here." Jones acknowledged at the hearing that he read this statement within a week or two after it was taken.

The Crutchfield case went to trial and a judgment for $40,000 was obtained. Thereafter, the case was settled for $30,000. Crutchfield was in St. Louis at Jones' office at the time the proceeds of this case were disbursed, and a dispute arose. Crutchfield contended that Candy had told him that Jones and his firm would take care of all medical expenses out of their fee, said expenses amounting to approximately $2,780. Payment of the sum of $2,100 to Candy concerning his ten percent contingent fee investigation contract was ultimately effected by means of a combined release and receipt executed by Candy.

Jack Hubbard resided in Loyall, Kentucky. In May of 1956, he sustained an injury to his right knee while working for the Louisville and Nashville Railroad at Verda, Kentucky. In August of 1956, he re-injured his right knee while working for the Louisville and Nashville Railroad at Corbin, Kentucky.

Subsequent to the second injury concerning his right knee, Jack Hubbard's wife was contacted by a Moses Jones who informed her that he wanted to get an attorney for her husband. Jack Hubbard had known Moses Jones some eight or nine years prior to that time by virtue of the fact that Moses Jones had formerly been an engineer on the Louisville and Nashville Railroad. Moses Jones then personally contacted Jack Hubbard and arranged to take Hubbard to Cincinnati, Ohio, to hire a lawyer. Moses Jones then took Jack Hubbard to Candy's office in Cincinnati, Ohio. While at Can-

dy's office, Candy advised Hubbard that he had a good case and should realize a good deal of money out of it. Candy further advised Hubbard that he would hire a lawyer for him, if he wished for Candy to do so. The only lawyer that Candy mentioned to Hubbard was F. Leland Jones. Hubbard signed one of Candy's ten percent contingent fee investigation contracts while at Candy's office.

Hubbard called F. Leland Jones at his office in St. Louis and requested that he come to Cincinnati, Ohio, to see him. On October 21, 1956, F. Leland Jones went to Cincinnati, Ohio, to see Jack Hubbard, at which time Candy was present. Jack Hubbard told F. Leland Jones at the time that Candy had recommended F. Leland Jones to him. Hubbard had never seen F. Leland Jones prior to the time he came to see him in Cincinnati, Ohio.

There is conflict between the testimony of Jack Hubbard and the testimony of F. Leland Jones as to exactly when, and under what circumstances, Hubbard actually employed F. Leland Jones as his attorney. Jack Hubbard's case was settled for $27,285. Candy received $2,273.75.

George Morgan Spears and his wife, Caroline Rowena Spears, resided in Portsmouth, Ohio. On September 12, 1956, Spears was injured while employed by the Norfolk and Western Railroad. Spears sustained a severe head injury and was hospitalized nineteen days.

Candy's initial contact with Spears was by means of a letter, dated September 27, 1956, from Candy to Spears. After Spears returned to his home from the hospital he was personally contacted by Candy. Candy displayed clippings of cases to Spears and advised Spears that if he would sign a ten percent contingent fee investigation contract he, Candy, would investigate his case and get him in touch with a good lawyer. F. Leland Jones was the lawyer that Candy got for George Morgan Spears.

Jones first saw Mr. and Mrs. Spears at his office in St. Louis. Spears executed a

contract employing Jones as his attorney on October 9, 1956, the date of his first visit to Jones' office. The Spears case was settled for $57,500. $5,750 was paid to the assignees who held Candy's ten percent contingent fee investigation contract.

Paul D. Pratt was injured on the 13th day of November, 1956, while employed by the Chesapeake and Ohio Railroad. Walter Candy obtained a ten percent contingent fee investigation contract from Pratt on December 7, 1956.

Pratt called Jones' office in St. Louis. Jones was not in the office. Thereafter, Jones contacted Pratt by means of a letter dated December 12, 1956, wherein Jones referred to Candy and to Pratt's contract with Candy.

The Pratt case was settled for $10,000. The sum of $912.50 was withheld by Jones to honor Candy's contingent fee contract and is still being held in a trust account.

Edward Lee Addison, formerly of Harrison, Indiana, resided at Route 1, Patriot, Indiana. In September of 1955, Addison sustained a back injury while employed by the Chesapeake and Ohio Railroad. Sometime during June or July of 1956, Candy and his wife made a visit to Addison's home. Addison was not home at the time but they talked to Mrs. Addison. Candy and his wife later returned to the Addison home at which time Candy represented to Addison that he was a private investigator. Candy further represented that he would investigate Addison's case and obtain all the facts concerning same. At that time Candy did not mention the names of any lawyers, but did tell Addison that he, Candy, had a good lawyer who worked with him whom he would like for Addison to hire. Thereafter, Jones and Candy together contacted Addison at his home. Addison had never seen and did not know Jones prior to the time Jones came to his home with Candy.

Addison signed a contract employing Jones as his attorney. Addison also signed a ten percent contingent fee investigation contract with Candy.

Addison had not called, written or contacted Jones by any means whatsoever prior to the initial visit Jones made to Addison's home with Candy. The initial visit made by Jones to Addison's home came about in view of the fact that Jones was having lunch with Candy in Cincinnati, Ohio, at which time Candy informed Jones that there was a man who lived near Cincinnati who was going to contact Jones and therefore Candy suggested that the two of them run out to see the man. Jones' initial contact with Addison occurred on August 15, 1956.

The Addison case was settled for $35,000 and the sum of $3,500 was set aside from the proceeds to honor Candy's ten percent contingent fee investigation contract. Jones learned that Candy was claiming that he had nothing coming under the ten percent contingent fee investigation contract in the Addison case and, in view thereof, Jones placed the sum of $3,500 in a trust account where it still remains.

Carlos B. Redden resided in Cincinnati, Ohio. On January 16, 1956, Carlos B. Redden was injured while employed by the New York Central Railroad. Following the date of his accident, Candy contacted Redden by telephone. According to Redden, Candy kept "pestering me on the phone" and Redden told Candy that he didn't want a lawyer and for Candy to leave him alone. However, Candy kept phoning Redden and telling him that he, Candy, was one of the best investigators in the country and that he would like for Redden to come to his office and talk with him. Eventually, Redden went to Candy's office and signed a ten percent contingent fee investigation contract with Candy. While at Candy's office, Candy mentioned the names of various lawyers in Chicago, Cincinnati and St. Louis and told Redden that said lawyers could get him a lot of money. Candy specifically told Redden that F. Leland Jones, a lawyer in St. Louis, could get him $150,000. Redden had never heard of Jones prior to that time.

After leaving Candy's office Redden went to a hotel in Cincinnati, where he obtained a St. Louis telephone directory and got F. Leland Jones' address. Redden then went to his home and wrote Jones a letter wherein he told Jones that he would like to employ him and arranged an appointment in St. Louis to see Jones. Redden employed Jones as his attorney on September 20, 1956. Jones was aware that Redden had come to see him by virtue of Candy's recommendation.

Redden's case against the New York Central Railroad was settled for $19,000. The sum of $1,900 was disbursed to various assignees and others under Candy's ten percent contingent fee investigation contract.

Donald G. Bruce, deceased, met his death on December 15, 1956, while employed by the Baltimore and Ohio Railroad. Lula Catherine Bruce, minor daughter of Mr. and Mrs. Jesse A. Suttles of Hamilton, Ohio, was the widow of Donald G. Bruce. Very shortly after Donald G. Bruce's death occurred on December 15, 1956, Candy called Jesse A. Suttles, father-in-law of Donald G. Bruce, and arranged to go to Suttles' home to see Suttles and his daughter.

When Candy arrived at the Suttles' home he made inquiry as to whether or not the family had an attorney to take care of the matter. Candy was advised that the family hadn't thought much about an attorney, whereupon Candy told the family that he would get a lawyer. Later on, Candy called the home and advised that he had a good lawyer in mind, namely, F. Leland Jones. Candy secured a ten percent contingent investigation contract from Lula Catherine Bruce, widow of Donald G. Bruce, same also being signed by Jesse Suttles and Mary Suttles, father and mother of Lula Catherine Bruce.

Jesse Suttles wrote a letter dated December 17, 1956, to F. Leland Jones. On December 18, 1956, Jones wrote to Lula Catherine Bruce and enclosed an employment contract to be executed by her and her father and mother, Mr. and Mrs. Jesse A. Suttles. Said employment contract was executed by Mrs. Donald G. Bruce, and Mr. and Mrs. Jesse Suttles, her parents, and returned by mail to Jones prior to the time that Jones contacted and saw Mrs. Donald G. Bruce and her parents in person at their home in Hamilton, Ohio, on December 26, 1956.

Jesse Suttles had never heard of F. Leland Jones before Candy mentioned his name. Neither Jesse Suttles nor his daughter, Lula Catherine Bruce, had ever met or seen Jones prior to the time Jones came to their home.

Later, the mother of Donald G. Bruce, deceased, was appointed Administratrix of his estate and, therefore, became legally vested with any claim for the wrongful death of Donald G. Bruce. Thereafter, bitterness erupted on the part of Walter Candy against F. Leland Jones.

The Commissioner found that Jones "violated Rules 4.27 and 4.28 of the Supreme Court of Missouri in that he, in conjunction with Walter Candy, solicited the claim of Lee Addison by personal communication and interview with the said Lee Addison and he employed a lay agent and runner, to wit, Walter Candy, for the purpose of soliciting the other cases set forth in the charges filed by the Advisory Committee of the Missouri Bar."

Rule 4.27, V.A.M.R., reads in part as follows: " *  *  *  solicitation of business *  *  * by personal communications or interviews, not warranted by personal relations, is unprofessional. *  *  *"

■ This rule applies to the Addison case. Jones and Candy contacted Addison at his home and obtained an employment contract from him without any invitation from Addison. Addison had not called, written or contacted Jones by any means whatsoever prior to Jones' visit to Addison's home. This was clear solicitation of business by personal communication and interview not warranted by personal relations.

Rule 4.28, V.A.M.R., reads in part as follows: " * * * Stirring up strife and litigation is not only unprofessional, but it is indictable at common law. It is disreputable * * * to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office * * *."

■ This rule involves the Shuler, Crutchfield, Hubbard, Spears, Pratt, Addison, Redden and Bruce cases. In all of these cases, Candy sought out persons with claims for personal injuries and brought or influenced the bringing of such cases to Jones' office. That this bred litigation is not seriously disputed. Candy, in all cases, obtained from the client a "contingent fee investigation contract." Jones, in all cases, "honored" Candy's contract. The question is whether, when Jones "honored" the "contingent fee investigation contracts," he directly or indirectly paid or rewarded Candy for soliciting and sending the cases to Jones. The Commissioner, in his report, finds that the amounts paid by Jones to Candy were completely disproportionate to the amount or value of any and all investigation services contemplated or performed. In re Randolph, Mo.Sup., 347 S.W.2d 91, cert. denied 368 U.S. 916, 82 S.Ct. 196, 7 L.Ed.2d 132; In re Frankel, 20 N.J. 588, 120 A.2d 603. While we do not disagree with the Commissioner's findings in this regard, we do not deem them essential to a determination of the question. The fact that Jones "honored" Candy's contract to any extent, even with the client's consent, was sufficient to constitute a reward for Candy's services in soliciting cases and sending them to Jones. We regard of no significance the fact that the client in all cases consented to the payment to Candy by Jones. A client is entitled to more protection by a lawyer than a contrary holding would imply. We cannot approve an ingenious practice, such as was devised here, whereby, under the guise of a "contingent fee investigation contract," the public could be subjected to all the evils and injustices that Rule 4.28, V.A.M.R., was intended to prevent. See 67 A.L.R.2d 859; 7 C.J.S. Attorney and Client § 23, pp. 758, 759, § 58, p. 843; 7 Am.Jur.2d, Attorneys at Law, § 42, pp. 68–71. Rule 4.28, V.A.M.R., was violated by Jones.

■ The next question is whether such violation was intentional. See Preamble to Rule 4, Canons of Ethics, V.A.M.R. We may find intent from the commission of the act itself, and the facts surrounding it. 7 C.J.S. Attorney and Client § 19, pp. 734–735; 22 C.J.S. Criminal Law § 33, pp. 118, 119. Jones urges that discipline should not be imposed for entertaining an erroneous interpretation of the Canons of Ethics and cites State ex rel. Barrett v. Farris, Mo.Sup., 264 S.W. 363; In re Moon, Mo.Sup., 310 S.W.2d 935; and In re Kaemmerer, Mo.App., 178 S.W.2d 474. These cases are distinguishable on the facts and do not assist Jones. We understand Jones' position to be that if he violated the Canons of Ethics in good faith he is not subject to disciplinary action. He drew certain analogies to other practices and indulged in an analysis which he alleges caused him to believe there was nothing wrong with what he was doing. The fallacy of his reasoning, and with his argument, is that his actions, viewed as a whole, inescapably show a participation in an arrangement violative of Rule 4.28, V.A.M.R. We cannot permit any attorney, endowed with an intellect sufficient to enable him to practice law, to excuse himself from disciplinary action on the premise that he had never read the Canons of Ethics or, if he had read them, that he was not competent to understand them and their application to facts confronting him. When an attorney accepts cases known by him to have been solicited and sent to him by a layman, and rewards the layman for his services, there is little room for interpretation. Jones knew Candy was soliciting cases, was send-

ing them to Jones, and that he, Jones, was being employed in said cases. When he knowingly acknowledged Candy's interest in each case by honoring Candy's contract, he knowingly participated in Candy's scheme. This is sufficient to satisfy any requirement of intent.

Jones contends that to hold him guilty of the charges here would violate the right to free speech guaranteed by the First Amendment to the Constitution of the United States. He states that Candy had a free-speech right to recommend Jones, that the clients had a free-speech right to accept Jones, and that Jones had a free-speech right to accept employment arising from the recommendations. He cites N. A. A. C. P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L. Ed.2d 405, and Brotherhood of Railroad Trainmen v. Virginia, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89. In N. A. A. C. P. v. Button, the United States Supreme Court upheld the right of the N. A. A. C. P. to solicit plaintiffs to designate N. A. A. C. P. staff attorneys to represent them in legal proceedings to achieve desegregation. In Brotherhood of Railroad Trainmen v. Virginia, the United States Supreme Court upheld the right of the Brotherhood of Railroad Trainmen to advise injured workers to obtain legal advice, to recommend specific attorneys, and upheld the rights of lawyers to accept employment under such circumstances. See Washington University Law Quarterly, June 1965, pp. 313–334.

■ We will not expand these rulings beyond the facts in those cases. It is accurate to say that any layman has a right to recommend a lawyer, any injured person has a right to accept such recommendation, and any lawyer has a right to accept employment in a proper set of circumstances. We also recognize some difficulty in reconciling traditional concepts of proper ethical conduct on the part of lawyers with the needs of people in our modern society. However, the facts in this case evidence practices we cannot condone.

■ Jones further contends that this proceeding has been conducted so as to deprive him of his right to due process of law under the Fourteenth Amendment to the Constitution of the United States of America, and Art. I, § 10 of the Const. of Missouri, V.A.M.S. He states that both the Commissioner and Informants were aware that Candy's testimony was perjurious, and thereafter failed to take any remedial action and permitted it to remain in the record throughout the trial. He states further that Informants took ex-parte statements from Candy for the purpose of disassociating themselves from Candy's perjury but Informants failed to make these statements available to Jones and the Commissioner until after Candy was dead and both parties had submitted their cases and briefs to the Commissioner. Jones cites a line of cases culminating in Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, for the proposition that the prosecution bears the duty upon request to make a full disclosure of all facts within the knowledge of the prosecution which tend either to support the defense of the accused or to impair the credibility of a prosecution witness. Had the instant proceeding been a criminal case before a jury, with the attendant doubt as to whether perjured testimony did or did not influence the jury, we would have a serious question here. State v. Eaton, Mo.Sup., 280 S.W.2d 63; State v. Eaton, Mo.Sup., 302 S.W.2d 866; State v. Statler, Mo.Sup., 383 S.W.2d 534. However, we have not considered Candy's testimony in our determination of this case. The ex-parte statements referred to, taken on April 29, 1960, at St. Louis, and on August 6, 1960, at the Ohio State Penitentiary, serve only to tell us that the attorneys for Informants were alarmed that Candy might implicate them in his giving of perjurious testimony. The statements could have been used in cross-examination of Candy to further destroy his credibility as a witness. However, we have held that Candy's testimony is unworthy of belief and have given it no weight whatsoever. The

829

case of United States v. Consolidated Laundries Corp., 2 Cir., 291 F.2d 563, cited by Jones, is not in point. Proof of prejudice is necessary if a denial of due process is to be made out. Napue v. People of State of Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L. Ed.2d 1217. Jones is not prejudiced in this regard.

We now consider the disciplinary action to be taken. Our purpose is not to punish but is to inquire into Jones' fitness to continue in the practice of law. In re Randolph, supra. Under all the facts and circumstances in this case, we will not order permanent disbarment.

We commend the Commissioner, the Advisory Committee and its attorneys, and the attorneys for Jones, for the manner in which this difficult proceeding was conducted.

It is ordered that F. Leland Jones be suspended and prohibited from the practice of law in Missouri until the further order of this Court and that he be permitted to apply to this Court for reinstatement after the expiration of one year from the adoption of this opinion, upon a showing that he is then a person fit to practice law as a member of the Bar of this State.

HOLMAN and HENLEY, JJ., concur.

STORCKMAN, C. J., and HYDE, FINCH, and EAGER, JJ., concur in part and dissent in part.

PER CURIAM.

The foregoing opinion is adopted as the opinion of the Court except as to the final paragraph in which the discipline is fixed. In lieu thereof, it is ordered that the respondent be suspended from the practice of law in Missouri until the further order of this Court and that he will be permitted to apply to this Court for reinstatement after the expiration of three years from the filing of this opinion upon a

showing that he is then a fit person to practice law as a member of the Bar of this State.

STORCKMAN, C. J., and HYDE, EAGER, and FINCH, JJ., concur.